A02A1573. DEPARTMENT OF TRANSPORTATION v. DUPREE et al.
(570 SE2d 1)

ELDRIDGE, Judge.

The Georgia Department of Transportation appeals from a judgment in a negligent design malpractice wrongful death action entered upon a jury verdict against it and in favor of Carolyn W. Dupree, administratrix of the estate of Betty N. Lamb, and for Samuel Lamb, husband of the deceased. Finding no merit to the appeal, we affirm.

At approximately 7:20 p.m. on November 25, 1996, a cloudy and overcast night, at the intersection of State Route 14 and High Point Road in Union City, Betty Lamb, a pedestrian, attempted to cross SR 14 (Roosevelt Highway, U. S. 29) going from east to west; when she

---

[3] *Dumas v. State*, 266 Ga. 797, 799 (2) (471 SE2d 508) (1996).

was near the western curb of the five-lane highway, Mrs. Lamb was struck and killed by a motorist going south in the west curb lane. SR 14 is 62 feet wide at this point and had been widened from 24 feet. The sight distance from the north to south at the intersection was between 250 and 320 feet. Generally accepted design and engineering standards recommend a sight distance of 550 feet for an intersection where approaching speed is 45 mph. SR 14 runs in a north-south direction, and the motorist was driving at 45 mph south, a car length behind a van, and both were in the same lane. Immediately before the intersection, the van suddenly swerved to the southbound inside lane without signaling. Mrs. Lamb was wearing dark blue slacks and jacket and black boots. There were no marked crosswalks at the intersection. The ambient light enshadowed but did not illuminate Mrs. Lamb. The motorist never saw Mrs. Lamb prior to striking her.

Beginning in October 1986, DOT began widening SR 14 from two to five lanes in the vicinity of and including the intersection as the Widening Project. As part of the Widening Project, DOT considered in the overall design the types of traffic controls to place at the intersection, which included whether or not to install a traffic signal there. Prior to October 1986, the final revision of the Widening Project plans and design was completed, and the final design negligently did not include a traffic control device at the intersection although this would negatively affect both motorists and pedestrians crossing. In August 1987, the Widening Project was completed without a traffic control signal at the intersection. In 1996, the intersection still had no traffic light prior to the death, and the closest traffic control device to slow traffic was nearly two miles away in either direction.

Since 1987, Union City had repeatedly sought a permit from DOT to install a traffic control light at the intersection, because the intersection had a high collision rate. The Manual of Uniform Traffic Control Devices ("MUTCD") adopted by DOT required a traffic engineering study prior to any determination to permit a traffic light. In 1987 and 1988 DOT performed such traffic engineering studies to evaluate the need for the issuance of a traffic signal permit and to determine its operational design. This MUTCD standard does not fall within the mandatory installation of traffic control devices but in the advisory area; it only recommends such installation. MUTCD contained "warrants" which describe conditions indicating the need for a traffic signal. Even where warrants existed justifying installation of such traffic signal, DOT did not permit the installation of a traffic control device until after the death. The basis for DOT's refusal from 1986 until 1996 to issue a permit was that there was no vehicle backup or delay at this intersection from its studies. Again in 1996, Union City requested a signal here, and DOT performed yet another traffic engineering study of the intersection. On November

20, 1996, the district field personnel recommended a signal be installed at the intersection. After November 25, 1996, DOT issued Union City the permit to install a traffic signal at this intersection. Such studies done after the completion of the Widening Project demonstrated that the traffic control device should have been included in the original planning and design to protect crossing pedestrians and to avoid collisions.

Here, SR 14 had been widened from two to five lanes, but DOT took the position that the additional through lanes created easier access from side streets through gaps in the traffic flow on the main roadway, avoiding traffic congregation, and that the intersection functioned more safely and efficiently without the presence of a stop and go traffic signal. Thus, DOT took the position that its denial of a signal was based upon sound engineering judgment, which it contended was based upon generally accepted engineering design standards and practices, because there was no problem with backup or delay, which was its primary criterion and concern.

However, plaintiffs' evidence demonstrated that DOT committed design and engineering malpractice in 1986 in omitting the traffic control device, in having too short a sight distance to the intersection, in having too wide an intersection for pedestrian crossing within the sight distance, and in allowing uninterrupted vehicle approach speeds of 45 mph. In 1986, there was one accident there, and six in 1987. DOT treated these as occurring during the construction process, which was a different factor. Plaintiffs' expert testified that during the eighteen months of the study period prior to October 13, 1987, there had been ten angle accidents and six other types of accidents at the intersection.

Attached to the complaint was an adequate and complete OCGA § 9-11-9.1 expert affidavit, which opined that the DOT design was negligently done through malpractice in design without the traffic control device, deviating from generally accepted engineering standards for pedestrian and vehicle safety. At trial, the plaintiffs' expert opinion evidence showed that the original Widening Project's designs and plans without a traffic signal at the intersection, the approach speed of 45 mph, and a deficient sight distance negligently violated generally accepted engineering standards and practices at that time.

In 1996, when DOT determined the approval of the installation of a traffic signal, it issued a permit to the local government specifying the signal design plan and the equipment to be installed, assigning maintenance responsibility, securing power services, and allocating funding resources for installation and operation of the signal.

1. DOT contends that the trial court erred in denying DOT's motion to dismiss for lack of subject matter jurisdiction on grounds of sovereign immunity. We do not agree for a number of reasons.

DOT's first motion to dismiss was for failure to state a claim upon which relief can be granted and raised lack of waiver of sovereign immunity, an OCGA § 9-11-12 (b) (6) motion on the merits. The trial court considered the motion to dismiss as an OCGA § 9-11-12 (b) (6) motion on the merits and properly denied the motion. DOT's application for interlocutory appeal was denied by this Court.

Subsequently, DOT made a motion to dismiss for lack of subject matter jurisdiction on the grounds of sovereign immunity and filed an affidavit with DOT's traffic studies. The deposition and affidavit of plaintiffs' expert Herman A. Hill, civil engineer, were filed in which he set out the basis for his opinion that DOT committed engineering and design malpractice. On April 19, 2001, after an OCGA § 9-11-12 (d) hearing, the trial court, after considering all the evidence on the OCGA § 9-11-12 (b) (1) motion to dismiss, denied it. This Court again denied an interlocutory appeal.

Under OCGA § 9-11-12 (b) (1), a defendant can raise a plea in abatement, which is not an adjudication on the merits, that raises the issue of the lack of subject matter jurisdiction in the trial court, but the grant of such motion only causes a dismissal of such action from the court without subject matter jurisdiction or until the condition precedent for subject matter jurisdiction has been satisfied, and the action can then be refiled. See generally *Ogden Equip. Co. v. Talmadge Farms*, 232 Ga. 614, 615 (208 SE2d 459) (1974); *Kim v. Dept. of Transp.*, 235 Ga. App. 480, 481-482 (2) (510 SE2d 50) (1998); *Hight v. Blankenship*, 199 Ga. App. 744, 745 (406 SE2d 241) (1991); *Taco Bell Corp. v. Calson Corp.*, 190 Ga. App. 481, 483 (379 SE2d 6) (1989) (physical precedent only); *Theo v. Nat. Union Fire Ins. Co.*, 99 Ga. App. 342, 347-348 (3) (109 SE2d 53) (1959). Sovereign immunity of a state agency is not an affirmative defense, going to the merits of the case, but raises the issue of the trial court's subject matter jurisdiction to try the case, and waiver of sovereign immunity "must be established by the party seeking to benefit from that waiver"; thus, the plaintiffs had the burden of establishing waiver of sovereign immunity. *Bd. of Regents &c. of Ga. v. Daniels*, 264 Ga. 328, 329 (446 SE2d 735) (1994); see also *Sherin v. Dept. of Human Resources*, 229 Ga. App. 621, 625 (4) (494 SE2d 518) (1997). With the deposition and affidavit of their expert witness, the plaintiffs carried their burden of proof on a motion to dismiss under OCGA § 9-11-12 (b) (1) by showing DOT's malpractice.

"Jurisdiction of a court to afford the relief sought is a matter which should be decided preliminarily, at the outset. Jurisdiction either exists or does not exist without regard to the merit[s] of the case." *Whitlock v. Barrett*, 158 Ga. App. 100, 103 (279 SE2d 244) (1981); accord *Kidd v. Unger*, 207 Ga. App. 109, 110 (1) (427 SE2d 82) (1993). Thus, when a court either has or lacks subject matter juris-

diction, despite any conflict in the facts, the trial court should as a threshold issue determine its jurisdiction. *Whitlock v. Barrett*, supra at 103.

(a) Where the determination of subject matter jurisdiction and waiver of sovereign immunity are so factually intertwined with determination of the merits of the case, it is not error for the trial court to defer final determination of such issues until trial, and such deferral would constitute the better practice to avoid the merits of the case. See OCGA § 9-11-12 (b), (d).[1] The determination of subject matter jurisdiction must be made by the trial judge prior to the entry of judgment, after the trial court has heard all the evidence, and the trial court may use the jury's verdict in an advisory capacity only. "A holding that issues of fact remained would necessitate the resolution of those facts and a determination of jurisdiction by the trial court; it would not be cause for submission to a jury." *Derbyshire v. United Builders Supplies*, 194 Ga. App. 840, 843 (1) (392 SE2d 37) (1990). Prior to entry of judgment the trial court shall enter an order deciding the issue of subject matter jurisdiction. Id.

(b) The next best approach by the trial court, where the issues of liability and subject matter jurisdiction are so intertwined that to decide subject matter jurisdiction requires determination of the merits, would be to make a preliminary determination and defer any final decision until trial on the merits. See OCGA § 9-11-12 (d); *Derbyshire v. United Builders Supplies*, supra at 843; *Sherwood Mem. Park v. Bryan*, 142 Ga. App. 664 (236 SE2d 903) (1977).

---

[1] If the plaintiff must make out a prima facie case on the merits through his evidence to meet his burden of proof to satisfy subject matter jurisdiction, then the trial court under OCGA § 9-11-12 (d) has the authority to resolve disputed issues of fact and to draw reasonable inferences from the evidence. In such situation where liability and subject matter jurisdiction are inextricably intertwined, a ruling for the plaintiff on subject matter jurisdiction also decides the issue of liability, leaving only the issue of damages for jury determination.

However, although OCGA § 9-11-12 (d) clothes the [trial] court with discretion to hear jurisdictional issues in advance of trial, it is a legal discretion which must balance the factors favoring pretrial determination of a defense against other circumstances favoring delay, and which generally should not be exercised to consider questions of jurisdiction which are largely co-extensive with the merits of a claim. In exercising this discretion, the court must balance the need to test the sufficiency of the defense or objection and the right of a party to have his defense or objection promptly decided and thereby possibly avoid costly litigation against such factors as the expense and delay the hearing may cause, the difficulty or likelihood of arriving at a meaningful result at the hearing, and the possibility that the issue to be decided on the hearing is so interwoven with the merits of the case that a postponement until trial is desirable. In particular, where determination of the defense will involve going into the merits, the question may well be reserved until trial. The rule is not intended to permit fragmentary and separate trials of issues that require coherent presentation for their just determination.

(Citations and punctuation omitted.) *Ga. Power Co. v. Harrison*, 253 Ga. 212, 214-215 (2) (318 SE2d 306) (1984).

In this design and engineering malpractice action against DOT, the plaintiffs attached to their complaint an expert witness' affidavit and submitted his deposition, which stated that DOT had committed malpractice in omitting the traffic control device from the design and planning of the Widening Project, deviating from generally accepted engineering standards then applicable. In its motion to dismiss for lack of subject matter jurisdiction, DOT attached an affidavit that identified and authenticated the DOT engineering studies.

While an OCGA § 9-11-9.1 affidavit does not require the plaintiff to prove a prima facie case, if the expert opinion is sufficient to demonstrate that the malpractice case is not frivolous, then it should also be sufficient for a preliminary ruling to satisfy subject matter jurisdiction. *Gadd v. Wilson & Co. &c.*, 262 Ga. 234, 235 (416 SE2d 285) (1992) (affidavit substantially met the requirements of the statute); *Bowen v. Adams*, 203 Ga. App. 123, 124 (416 SE2d 102) (1992) (whether the affidavit has to meet standards necessary to defeat a motion for grant of OCGA § 9-11-56). Such affidavit requirement applies to a malpractice action against an engineering professional. *Kneip v. Southern Engineering Co.*, 260 Ga. 409 (2) (395 SE2d 809) (1990); *Dept. of Transp. v. Cushway*, 240 Ga. App. 464, 466 (523 SE2d 340) (1999); *Jackson v. Dept. of Transp.*, 201 Ga. App. 863, 865-866 (412 SE2d 847) (1991). An expert's affidavit that satisfies this section does not have to unequivocally demonstrate the evidentiary merits of the malpractice claim unless or until the defendant moves for summary judgment and submits evidence demonstrating the plaintiff's claim lacks merit, and may rest upon evidentiary conclusions. *Lennen v. Dept. of Transp.*, 239 Ga. App. 729, 730 (1) (521 SE2d 885) (1999); *Bowen v. Adams*, supra at 124; see also *Ulbrich v. Batts*, 206 Ga. App. 74, 75 (424 SE2d 288) (1992); *0-1 Doctors Mem. Holding Co. v. Moore*, 190 Ga. App. 286, 287-288 (378 SE2d 708) (1989). An affidavit sufficient under OCGA § 9-11-9.1 should be sufficient to make out subject matter jurisdiction as to DOT's malpractice as a preliminary matter, because malpractice is not finally determined at such time on the merits and is based upon an opinion that can be fully tested on motion for summary judgment or trial. *Hewett v. Kalish*, 264 Ga. 183, 184-186 (1) (442 SE2d 233) (1994); *Stubbs v. Ray*, 218 Ga. App. 420-421 (1) (461 SE2d 906) (1995).

Generally, issues of the waiver of sovereign immunity are issues of law for determination by the trial court under an OCGA § 9-11-12 (b) (1) motion based upon the face of the complaint where the nature of the complaint indicates whether there is waiver with undisputed facts. However, under OCGA § 50-21-24, waiver of sovereign immunity may be a mixed question of law and fact for the trial court's determination; subsections (1), (10), (12), and (13) of this Code section are based upon a factual predicate to determine nonwaiver; the

facts may be in dispute. Specifically applicable in this case, the "plan or design for construction of or improvement to highways, roads, streets, bridges, or other public works where . . . plan or design" does not waive sovereign immunity, if, and only if, the trial court finds that it was *"prepared in substantial compliance with generally accepted engineering or design standards in effect at the time of preparation of the plan or design."* (Emphasis supplied.) OCGA § 50-21-24 (10); *Daniels v. Dept. of Transp.*, 222 Ga. App. 237 (474 SE2d 26) (1996); *Dept. of Transp. v. Brown*, 218 Ga. App. 178 (460 SE2d 812) (1995), aff'd, 267 Ga. 6 (471 SE2d 849) (1996). Thus, to determine waiver, the trial court must find, based upon expert opinion, that a material issue of fact exists that DOT negligently planned and designed the Widening Project contrary to generally accepted engineering and design standards then in effect for the issue of liability to be tried. Therefore, the questions of malpractice and of waiver of sovereign immunity are intertwined, because a final determination by the trial court of waiver of sovereign immunity also is a final determination of DOT's liability for malpractice, which constituted the waiver. OCGA § 50-21-24 (10); *Daniels v. Dept. of Transp.*, supra at 237; *Dept. of Transp. v. Brown*, supra, 218 Ga. App. at 178. Thus, the trial court in determining subject matter jurisdiction must make a preliminary determination that a material issue of fact exists for jury determination that DOT negligently designed the intersection in deviation from the generally accepted engineering standards at such time; however, if it appears from the evidence that there is no issue of design negligence in deviation from the generally accepted engineering or design standards or that it is unlikely of proof, then the motion to dismiss should be granted for lack of subject matter jurisdiction, because there exists no waiver by DOT's malpractice. See *Dept. of Transp. v. Brown*, supra, 267 Ga. at 8. Therefore, the trial court should not make a final adjudication upon the merits of the case that malpractice occurred but must determine that there exists a material issue of fact for jury determination that malpractice may have occurred, which waives sovereign immunity if the jury finds, in fact, malpractice by DOT.[2]

---

[2] By analogy, the intertwining of factual issues of subject matter jurisdiction and tort liability are like the determination of Long Arm jurisdiction. See generally *Atlanta Propeller Svc. v. Hoffman GMBH & Co. KG*, 191 Ga. App. 529 (382 SE2d 109) (1989). Where the evidence shows that no tort or injury occurred in Georgia, the action is dismissed, but if there was evidence that a tort or injury occurred in Georgia, then jurisdiction is found. Id. at 530 (1). Georgia applies Long Arm tort jurisdiction to the outer constitutional limits when there is either a tort or injury in Georgia, but such determination does not determine liability. See generally *Coe & Payne Co. v. Wood-Mosaic Corp.*, 230 Ga. 58, 60 (195 SE2d 399) (1973). "Thus, pursuant to OCGA § 9-10-91 [(2) or] (3) jurisdiction may be exercised as to plaintiffs' cause of action alleging a tortious injury in this state caused by [defendant's] alleged negligence in manufacturing the [product] outside the state." *Showa Denko K.K. v. Pangle*, 202

Under OCGA § 9-11-12 (d), the section provides that:

> [t]he defenses specifically enumerated in paragraphs (1) through (7) of subsection (b) of this Code section, whether made in a pleading or by motion, and the motion for judgment mentioned in subsection (c) of this Code section shall be heard and determined before [the] trial on application of any party unless the court orders that the hearing and determination thereof be deferred until the trial.

Thus, the trial court may hear evidence to determine the defense in abatement or may defer such determination until trial. OCGA § 9-11-12 (d); *Hardy v. Arcemont*, 213 Ga. App. 243 (444 SE2d 327) (1994); *Myers v. McLarty*, 150 Ga. App. 432, 433 (258 SE2d 56) (1979); *Marvin L. Walker & Assoc. v. A. L. Buschman, Inc.*, 147 Ga. App. 851, 852 (1) (250 SE2d 532) (1978). Likewise, the trial court must determine such factual issues as to jurisdiction in a motion to set aside judgment. *Montgomery v. USS Agri-Chem. Div.*, 155 Ga. App. 189, 190 (1) (270 SE2d 362) (1980). The trial judge may determine such issues on conflicting evidence prior to trial. *Williamson v. Williamson*, 155 Ga. App. 271, 273 (2) (270 SE2d 692) (1980), aff'd, 247 Ga. 260, 263 (2) (275 SE2d 42) (1981); *Daughtry v. Chaney-Bush Irrigation*, 166 Ga. App. 708, 709 (1) (305 SE2d 439) (1983). All parties may present evidence at an OCGA § 9-11-12 (d) hearing, and the factual issues of subject matter jurisdiction shall be determined by the trial court. *Newport Timber Corp. v. Floyd*, 247 Ga. 535, 539 (277 SE2d 646) (1981); *Clements v. Hendi*, 182 Ga. App. 118, 119 (1) (354 SE2d 700) (1987); *Attwell v. Heritage Bank Mt. Pleasant*, 161 Ga. App. 193, 194 (2) (291 SE2d 28) (1982). The trial court cannot refuse to hear evidence at the hearing, except to order the hearing and determination of the motion in abatement be deferred until trial. *Sherwood Mem. Park v. Bryan*, supra at 665. The Civil Practice Act gave the trial court great discretion in determining when, as a matter of judicial economy, to decide an OCGA § 9-11-12 (b) abatement motion.

(c) In this case, the trial court denied both a motion to dismiss based upon a failure to state a cause of action regarding sovereign immunity and a motion to dismiss for lack of subject matter jurisdiction after hearing evidence that there was a waiver of sovereign immunity by DOT's malpractice. This Court twice refused to grant

---

Ga. App. 245, 247 (1) (414 SE2d 658) (1991). "The trial court was empowered by OCGA § 9-11-12 (d) to determine factual issues in regard to whether there had been minimum contact so as to authorize jurisdiction over defendants pursuant to OCGA § 9-10-91." (Citations omitted.) *Pascavage v. Can-Do, Inc.*, 178 Ga. App. 566 (344 SE2d 261) (1986).

interlocutory appeals. When the trial court determines a jurisdictional issue based upon conflicting factual issues, "[o]n appeal, the court's finding on a factual issue will be sustained if there is evidence which authorizes the finding." (Citation omitted.) *Hardy v. Arcemont*, supra at 243; see also *Watts v. Kegler*, 133 Ga. App. 231, 233 (3) (211 SE2d 177) (1974). In making its determination of subject matter jurisdiction after considering the plaintiffs' expert deposition and affidavit and DOT's traffic studies at an OCGA § 9-11-12 (d) hearing, the trial court on conflicting evidence found subject matter jurisdiction.

> When ruling on a motion to dismiss based upon jurisdictional grounds, the trial court must make the determination acting as the trier of fact. *Big Canoe Corp. v. Williamson*, 168 Ga. App. 179, 180 (308 SE2d 440) (1983); *Montgomery v. USS Agri-Chem. Div.*, [supra at 190 (1)]. Its evaluation rests on where the preponderance of evidence lies, not necessarily on whether the issue may be decided as a matter of law. *Barrow v. Gen. Motors Corp.*, 172 Ga. App. 287, 288 (2) (322 SE2d 900) (1984).

*Derbyshire v. United Builders Supplies*, supra at 842-843.

In this case, the trial court submitted to the jury the determination whether or not in the design and plans for the Widening Project the failure to include a traffic control device at the intersection constituted a negligent departure from substantial compliance from generally accepted engineering practices at such time. By allowing the case to go to trial on the issue of malpractice in design, the trial court found that under OCGA § 50-21-24 (10) a waiver of sovereign immunity had possibly occurred from the evidence before it. "Factual determinations of the trier of fact will be reversed only where the evidence demands a contrary finding, and when the trial judge conducts a hearing on a motion to dismiss [for lack of subject matter jurisdiction], his findings, as a trier of fact, are tested by the any evidence rule." (Citation omitted.) *McLendon v. Albany Warehouse Co.*, 203 Ga. App. 865, 866 (1) (418 SE2d 130) (1992); accord *Montgomery v. USS Agri-Chem. Div.*, supra at 190 (1). Even if the plaintiffs, through deposition of their expert and his affidavit at the OCGA § 9-11-12 (d) hearing, did not produce sufficient evidence to prove waiver and negligence in design, then such harmless error was cured and overcome at trial with plaintiffs' case-in-chief where the jury found negligent design of the intersection by DOT and the trial court entered judgment.

2. DOT contends that the trial court erred in denying its motion for directed verdict on the design exception to sovereign immunity. We do not agree.

"The Georgia Tort Claims Act provides a waiver of the state's sovereign immunity for torts of state officers and employees while acting within the scope of their official duties unless the alleged tortious act falls within one of the exceptions set forth in OCGA § 50-21-24. The highway design standards exception provides" an exception only when there was no engineering design and planning malpractice by DOT. (Citations omitted.) *Dept. of Transp. v. Brown*, supra, 218 Ga. App. at 178-179 (1). "The highway design exception to the Georgia Tort Claims Act requires that expert testimony or other competent evidence be submitted to show that the plan or design was not prepared in substantial compliance with generally accepted engineering or design standards at the time such plan was prepared." Id. at 179.

"Where and whether to install traffic lights were design decisions. When to open the intersection, and whether to open it without traffic lights are operational decisions, and the decision to use stop signs . . . for the cross-road was a design decision." *Dept. of Transp. v. Brown*, supra, 267 Ga. at 7 (1). Thus, the plaintiffs in complying with OCGA § 9-11-9.1 raised an engineering malpractice action against DOT for failure to include traffic control devices at the intersection in the initial plans and designs as well as the deficient sight distance, and the plaintiffs at trial supported such claim for engineering malpractice with their expert witness and evidence.

> The design standard exception does not make reference to MUTCD; it refers to "generally accepted engineering or design standards." While MUTCD certainly has that status in this state (OCGA § 32-6-50), it does not have the status of being the exclusive source of engineering and design standards that DOT suggests. If the legislature intended to limit the source of standards to MUTCD or to written mandatory standards as DOT suggests, it could have done so specifically, but it did not. . . . Just as expert witnesses are competent to establish standards in other professional malpractice actions ("[i]n malpractice actions, a plaintiff must present expert testimony 'to establish the parameters of acceptable professional conduct,'") we see no reason, and DOT has supplied none, why expert witnesses should not be competent to do so in actions against DOT for engineering malpractice. Contrary to DOT's assertion on appeal, the record contains expert testimony that some of DOT's actions and failures to act with regard to the intersection involved in this case violated generally accepted engineering standards. That testimony conforms to the requirements of the statute. We agree with the Court of Appeals that the trial

court did not err in denying DOT's motion for directed verdict on the question of whether DOT violated generally accepted engineering standards, thus removing it from the protection of the design standards exception.

(Citations omitted.) Id. at 8 (2).

Hill, a civil engineer with highway design expertise, testified for the plaintiffs that he had studied the intersection from 1978 to 1996; that historically there had been numerous collisions there after the widening; that increasing the lanes to five without a traffic control device doubled the risk of collisions because of the deficient sight distance; that under the standard of engineering care in 1986, DOT should have included a traffic control device in the design for the Widening Project; and that DOT departed from the engineering standard of care in design and planning in not requiring and including a traffic control device at this intersection in 1986 with the deficient sight distance and the uninterrupted speed of 45 mph. With the widening and with the deficient sight distance, motorists approaching the intersection at 45 mph could not stop before reaching the intersection for traffic or for crossing pedestrians, which increased the dangerousness of the intersection in deviation from generally accepted engineering design standards. The traffic studies after 1986 showing collisions confirmed that it was negligent not to require a traffic control device in the 1986 plans with the deficient sight distance and speeds of 45 mph. He also testified that widening without a traffic control also increased speed from either direction where the nearest traffic control device was over a mile in either direction and that there should be a sight distance of 550 feet for speed of 45 mph to allow safe stopping at the intersection. But, as designed, this intersection had a sight distance of only 250 to 320 feet to the north, which added to the danger without a traffic control device. This deficient sight distance also deviated from the generally accepted engineering design standards in effect in 1986. A pedestrian would cross at the average walking speed of four feet per second and would take thirteen seconds to cross the highway at the intersection. The uninterrupted motorist speed of 45 mph, the deficient sight distance, the width of 62 feet, and the absence of a traffic signal all made this intersection dangerous for pedestrians, because it would take a vehicle at that speed only 14 to 15 seconds to reach the intersection from the extreme of the sight distance. Thus, in the 1986 design, DOT departed from the generally accepted engineering design standard of care regarding pedestrian crossing at the intersection. The subsequent engineering traffic studies corroborated this opinion that DOT had been negligent in 1986 in failing to require a traffic control device at the intersection as demonstrated by the many collisions.

"[T]he trial court did not err in denying DOT's motion for directed verdict on the question of whether DOT violated generally accepted engineering standards, thus removing it from the protection of the design standards exception." *Dept. of Transp. v. Brown*, supra, 267 Ga. at 8 (2).

Further, John Padgett, retired DOT district traffic engineer, testified for the plaintiffs that from August 1987 until August 1988 there had been nine accidents, of which seven had been angle collisions and of which four involved injuries, which a traffic control signal would have prevented. Angela B. Bastion, former DOT traffic engineer, testified that between January 1986 and June 1987 there had been ten angle collisions at the intersection; the north sight distance from the intersection as designed by DOT was only 320 feet; in 1994 six right angle collisions and one rear-end collision had occurred; and in 1995 there were four right angle collisions. She further testified that there was a MARTA stop at the intersection, an apartment complex on the west side of the road, and pedestrian traffic crossing SR 14 was heavy, because of a pay telephone at the AMOCO store. The nearest traffic light to the intersection was 1.97 miles away to the north.

3. DOT contends that the trial court erred in denying its motion for directed verdict on the permit exception to sovereign immunity. We agree that the permit exception prevented sovereign immunity from being waived as to negligence in failing to issue the permit for a traffic light after completion of the Widening Project.

Under OCGA § 50-21-24 (9), the Act creates a permit exception to waiver of sovereign immunity as to: "Licensing powers or functions, including, but not limited to, the issuance, denial, suspension, or revocation of or the failure or refusal to issue, deny, suspend, or revoke any permit, license, certificate, approval, order, or similar authorization." For a municipality to acquire a traffic control device, someone must conduct an engineering study, and DOT must exercise its professional discretion either to grant or deny a permit to erect such traffic control device. *Whitley v. Gwinnett County*, 221 Ga. App. 18, 19 (1) (470 SE2d 724) (1996).

Failure to timely issue a permit to install a traffic control device does not waive sovereign immunity. *Dept. of Transp. v. Cox*, 246 Ga. App. 221, 224 (540 SE2d 218) (2000); *Dept. of Transp. v. Bishop*, 216 Ga. App. 57 (1) (453 SE2d 478) (1995).

In Divisions 1 and 2, we determined that the issue of design malpractice waived sovereign immunity, which included the failure to require that a traffic control device be installed at the intersection under the Widening Project, and which proved DOT committed design malpractice. Subsequent evidence as to the absence of the traffic control device and the various studies was relevant and mate-

rial as to the knowledge, necessity of, and feasibility of the installation of such traffic control device as part of the original Widening Project design and plans deviating from the generally accepted engineering standards at such time. The failure to direct a verdict on this issue has no effect on the verdict and judgment. Further, the effect of the denial of such motion on the verdict and judgment was not raised and preserved before the trial court in a motion for new trial.

4. The DOT contends that the trial court erred in denying its motion for directed verdict on the administratrix's claim for pre-impact pain and suffering. We do not agree.

For pre-impact pain and suffering to be awarded, the jury must have some evidence that the deceased at some point in time was conscious of her imminent death; the jury may infer such consciousness from evidence immediately prior to impact or following her injury. *Monk v. Dial*, 212 Ga. App. 362 (441 SE2d 857) (1994).

> Nonetheless, from evidence that the [van] veered shortly before the [car struck the decedent], the jury could infer that [the] decedent was aware of the impending [impact], and from these circumstances could extrapolate the probable mental state of [the] decedent in [the] last moment of consciousness. The fright, shock, and mental suffering experienced by an individual due to wrongful acts of negligence will authorize a recovery where attended with physical injury. Contrary to defendant['s] assertion, we find no requirement that the physical injury precede the mental pain and suffering.

(Citations omitted.) Id. at 362 (1).

While the driver of the car that struck Mrs. Lamb did not see her, this does not give rise to the inference that Mrs. Lamb did not both see and hear the van and the car as they bore down upon her at 45 mph when she was only part of a lane from the safety of the west curb. The headlights would have been visible to Mrs. Lamb at least 150 feet away from her. Mrs. Lamb would have been able to see the approaching headlights rounding the curve over 350 feet away and up to 14 seconds away. Since it would take the van approximately 120 to 180 feet to change lanes, then Mrs. Lamb would have had several seconds to realize her deadly peril as the headlights of the following car loomed behind the swerving van. Thus, Mrs. Lamb would have gone from relief at seeing the van swerve away from her to horror at seeing the car's lights looming at her in her lane. Thus, denial of the motion was proper.

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED JULY 24, 2002 

Thurbert E. Baker, Attorney General, Kathleen M. Pacious, Deputy Attorney General, Loretta L. Pinkston, Senior Assistant Attorney General, Robert C. Edwards, Assistant Attorney General, for appellant.

Johnson & Ward, William D. deGolian, William C. Lanham, Clark H. McGehee, for appellees.