Blair v. Frank Whitcomb Construction Corp., No. 498-01 CnC (Norton, J., July 26, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

HOPE BLAIR, Individually and as Administratrix
of the Estate of Brian K. Blair, and NIKI BLAIR, In her
capacity as guardian of Bryana Blair

v.

FRANK W. WHITCOMB CONSTRUCTION
CORPORATION and STATE OF VERMONT

ENTRY

This case concerns a traffic accident in which the passenger, Brian K. Blair, was killed. The plaintiffs have filed survival, wrongful death, and loss of consortium claims against the State of Vermont and Frank W. Whitcomb Construction Corporation, which was undergoing road work under contract with the State where the accident took place. In a previous entry, this court denied the State's summary judgment motion, holding that the State was not protected by sovereign immunity. The State has filed a motion for reconsideration or, in the alternative, for permission to appeal pursuant to V.R.A.P. 5 and 5.1.

The State raises no new legal or factual arguments that require modification of the court's entry. The State's primary argument boils down to the claim that the court should credit the State's witnesses who allege that the regulatory standard in question—Standard E-108—confers discretion upon highway engineers such that the acts or omissions of the

State employee in this case fell with the discretionary function exception to the Vermont Tort Claims Act, 12 V.S.A. § 5601(e)(1). Standard E-108 evinces no such discretionary language, but the State claims that its witness testimony "proves" it is discretionary.

The court begs to differ. Proof of discretionary standards would be language written in the standard to the effect of: "This standard is discretionary." See, e.g., Estate of Gage v. State, 2005 VT 78, ¶ 9 (holding State guidelines discretionary where guidelines provided "suggested criteria" for State engineers); Searles v. Agency of Transp., 171 Vt. 562, 564 (2000) (mem.) (holding that statement concerning "engineering judgment" rendered manual discretionary). The State, along with the engineers and regulators who drafted Standard E-108, was capable of adding such language within Standard E-108. It did not. Saying something is discretionary does not make it so.

The State also argues that the Manual on Uniform Traffic Control Devices (MUTCD) confers discretion with respect to the State employee's acts or omissions. As the court noted in its entry, the standards appended to the contract for the construction work in this case provided that "[a]ll traffic control devices shall conform to the contract requirements and the MUTCD." The conjunctive "and" means that this phrase must be read as follows: (1) traffic control devices shall conform to the contract requirements (e.g., Standard E-108) and (2) traffic control devices shall conform to the MUTCD. Even if the MUTCD confers discretion, Standard E-108 does not. Thus, the MUTCD's discretionary language has no bearing on the court's decision.

The State also takes issue with the court's application of the presumption under United States v. Gaubert, 499 U.S. 315 (1991), arguing that the court inappropriately laden the State with the burden of proof to show that the discretion was "'grounded in social, economic, and political policy.'" Berkovitz v. United States, 486 U.S. 531, 537 (1988) (quoting United States v. Varig Airlines, 467 U.S. 797, 814 (1984)). Under Gaubert:

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that

can be said to be grounded in the policy of the regulatory regime.

499 U.S. at 324–25; see also Searles v. Agency of Transp., 171 Vt. 562, 563–64 (2000) (adopting Gaubert analysis).

As the Gaubert Court held, the presumption that a government agent's actions are grounded in policy applies only where "governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion." Standard E-108 does not confer discretion. The only possible discretion would come from unwritten procedures and practices expressed by the State's witnesses. Such discretion does not give rise to a presumption that those same witnesses' actions are grounded in State policy. Hence, the State properly retained the burden to show that the alleged discretion of its employees in this case was grounded in policy. As the State failed to meet its burden, the court denied its summary judgment motion.

The court's decision is also not affected by the Vermont Supreme Court's most recent pronouncement regarding the discretionary function exception. In Gage, the Court held that the placement of guardrails is discretionary because "the State's policy vested extensive discretion in its highway officials" with regard to guardrails where the hazard lies outside of thirty feet from the edge of the driving lane. 2005 VT 78, ¶¶ 6–7. The Court also held that the guardrail "determination involved precisely the kind of policy judgments—the weighing of risks, financial costs, and environmental and aesthetic impacts—that the discretionary-function exception was designed to protect." Id., ¶ 7.

Here, even were the court to credit the State's evidence of discretion, the State failed to demonstrate that the use of channelization devices involved weighing of risks, financial costs, and environmental and aesthetic impacts. Although the State submitted evidence that channelizing devices may render a roadway too narrow, those were not the circumstances at the construction site in this case.[1] The State also would not bear

---

[1] The resident engineer at the construction site, William Flanders, testified that channelization devices might have narrowed the roadway. Standard E-108 accounts for the shoulder width in determining whether to use channelization devices. The width at the scene of the accident—3.8 feet—was such that channelization devices would have been appropriate under Standard E-108. A simple statement that the devices may have narrowed the roadway does not support a holding that Flanders had to forgo channelization devices in favor of public safety.

significantly greater costs, given that the construction firm would ultimately be responsible under the contract for providing traffic devices. Finally, in a temporary construction site, the State is obviously not concerned with the environmental and aesthetic impact of orange cones, rubber barrels, or blinking lights. In short, the State has failed to provide any broader policy justification weighing against the use of channelization devices where there is a 4–6 inch drop-off at the edge of a road under construction and a 3.8 foot shoulder on which to place the channelization devices.

The plaintiff in Gage also provided a State standard to demonstrate that State agents lacked discretion to leave out a guardrail at the location of the accident. The standard, however, emphasized that its provisions were "suggested criteria," not mandates. Gage, 2005 VT 78, ¶ 9. Therefore, the standard differed from Standard E-108 in this case.

Finally, the State argues that the court erred in its interpretation of 12 V.S.A. § 5601(e)(8), which provides an exception to the State's waiver of sovereign immunity for "[a]ny claim arising from the selection of or purposeful deviation from a particular set of standards for the planning and design of highways." As the Vermont Supreme Court has held, in interpreting a statute, "[t]he Legislature is presumed to have intended the plain, ordinary meaning of the adopted statutory language. If the statute is unambiguous and the words have plain meaning, we accept that plain meaning as the intent of the Legislature and our inquiry proceeds no further." Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341, 346 (2002) (citation omitted). Under its plain meaning, "planning and design of highways" refers to highways on which one would drive on a day-to-day basis, not those on which one would negotiate construction sites. The State would have the court read this phrase to mean "planning and design of the construction of highways." That is not the plain meaning of the phrase.

The cases that the State cites in support of its interpretation of § 5601(e)(8) are inapposite. Lane v. State, 174 Vt. 219 (2002), addressed the State's "decisions to pave the highway with open graded pavement." Id. at 229. This had nothing to do with the safety procedures used in actually paving the highway. It merely concerned the design of the finished highway. McIntosh v. Sullivan, 875 A.2d 459 (Conn. 2005), addressed a

---

Channelization devices always narrow the roadway. That appears to be the point of using them— to warn drivers against going off the edge of a drop-off.

defective highway liability statute, Conn. Gen. Stat. § 13a-144, for which there is no analog under Vermont law. Dept. of Transp. v. Dupree, 570 S.E.2d 1 (Ga. App. 2002), concerned a statute stating: "'plan or design for construction of or improvement to highways, roads, streets, bridges, or other public works.'" Id. at 7 (quoting Ga. Code Ann. § 50-21-24(10)) (emphasis added). If anything, this case supports the court's decision, as § 5601(e)(8) lacks the "construction of or improvement to" language and merely provides an exception for planning or design of highways. Finally, Haynes v. Franklin, 767 N.E.2d 1146 (Ohio 2002), interprets a political subdivision tort liability statute that excepts "governmental functions" which include "the maintenance and repair of roads." Id. at 1149 (citing Ohio Rev. Code § 2744.01(C)(2)(e)). Again, § 5601(e)(8) is not so worded.

Accordingly, the court declines to revisit its prior decision and denies the State's motion for reconsideration.

Turning to the State's alternative motion for permission to appeal, the State argues that an interlocutory appeal is appropriate pursuant to V.R.A.P. 5.1. Codifying the collateral order doctrine, this rule provides that:

> a superior judge . . . may permit an appeal to be taken from any interlocutory order or ruling if the judge finds that the order or ruling conclusively determines a disputed question, resolves an important issue completely separate from the merits of the action, and will be effectively unreviewable on appeal from a final judgment.

V.R.A.P. 5.1(a). Such an interlocutory appeal "is available only 'in the small number of extraordinary cases where the normal appellate route will almost surely work injustice.'" V.R.A.P. 5.1, Reporter's Notes—1990 Amendment (quoting In re Maple Tree Place Assocs., 151 Vt. 331, 333 (1989) (per curiam)).

Courts have been inclined to grant interlocutory review of absolute and qualified immunity determinations given the personal expense to government officials in partaking in a full trial after a denial of immunity from suit. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 527–30 (1985); Murray v. White, 155 Vt. 621, 626–28 (1991); 15A Wright, et al., Federal Practice and Procedure § 3914.10 (2005). The same reasoning does not

necessarily extend to governments as a whole with respect to sovereign immunity determinations, though.

> Although appeals often have been allowed, the government defendants involved in these cases cannot assert any substantial measure of the interests that were relied upon to permit appeal by individual officials. The burden of continuing litigation is not as likely to discourage courageous action, distract from continuing duties, or deter responsible people from accepting public office. . . . Many government parties, further, can fairly be described as institutional litigants that routinely bear the burdens of trial. Real advantages would flow from adopting a clear rule that domestic government bodies cannot themselves invoke the immunity appeal doctrine made available to government officials.

Wright, et al., supra.

At least two federal courts have determined that because U.S. sovereign immunity is akin to a freedom from liability, rather than a freedom from suit altogether, collateral order review is inappropriate for pre-trial sovereign immunity decisions. See State of Alaska v. United States, 64 F.3d 1352, 1356 (9th Cir. 1995) ("Because federal sovereign immunity is a defense to liability rather than a right to be free from trial, the benefits of immunity are not lost if review is postponed."); Pullman Const. Industr., Inc. v. United States, 23 F.3d 1166, 1169 (7th Cir. 1994) (holding that U.S. sovereign immunity does not give rise to collateral order review because, unlike Eleventh Amendment and Foreign Sovereign Immunities Act, sovereign immunity confers right not to pay damages, not right to be free from suit); see also CSX Transp., Inc. v. Kissimmee Utility Auth., 153 F.3d 1283, 1286 (11th Cir. 1998) (same, applying Florida sovereign immunity law). But see In re Sealed Case No. 99-3091, 192 F.3d 995, 999 (C.A.D.C. 1999) (holding that sovereign immunity gives rise to collateral order review).

Vermont sovereign immunity differs from U.S. sovereign immunity, though. The Vermont Supreme Court has held that whether sovereign immunity exists is a jurisdictional question. Lane v. State, 174 Vt. 219, 222 (2002). "The controlling law is well settled. Lawsuits against the State are barred unless the State waives its sovereign immunity." Estate of Gage v. State, 2005 VT 78, ¶ 4 (citing Denis Bail Bonds, Inc. v.

6

State, 159 Vt. 481, 484–85 (1993)). Thus, unlike U.S. sovereign immunity, Vermont sovereign immunity is more akin to freedom from suit than freedom from liability.

Accordingly, collateral order review is as appropriate with sovereign immunity decisions as with absolute and qualified immunity determinations. The V.R.A.P. 5.1(a) standards are met here. The court's summary judgment denial (as well as the above denial of the State's motion for reconsideration) constitutes a conclusive determination of the disputed question regarding sovereign immunity. Whether the State can enjoy sovereign immunity is an issue separate from the merits of this action. And because sovereign immunity protects the State from suits, the court's decision that the State cannot enjoy sovereign immunity is effectively unreviewable from a final judgment order, which would occur most likely after the parties have tried the case on the merits. The court therefore grants the State's motion to appeal the court's summary judgment order regarding the State's sovereign immunity in this case.[2] This case shall be stayed pending the results of the State's appeal.

ORDER

For the foregoing reasons, the State's motion for reconsideration is DENIED and the State's motion for permission to appeal is GRANTED. This case shall be STAYED pending the results of the State's appeal.

Dated at Burlington, Vermont, July 26, 2005.


_____/s/_____
                                                              Judge

---

[2] Given the court's decision pursuant to V.R.A.P. 5.1, the court need not address whether an interlocutory appeal is appropriate under V.R.A.P. 5.