694 S.E.2d 115 (2010)
GEORGIA DEPARTMENT OF HUMAN RESOURCES et al.
v.
BULBALIA et al.
No. A09A1961.
Court of Appeals of Georgia.
March 23, 2010.
*116 Thurbert E. Baker, Atty. Gen., Robert L. Bunner, Asst. Atty. Gen., for appellants.
Nicol J. Hanyard, Charles A. Mathis, Jr., Jane N. Wilkes, Atlanta, for appellees.
DOYLE, Judge.
Eleven-year-old I.B. was hit by a car while in foster care. His parents, Louis Bulbalia and Beverly Kerr, filed suit against the Georgia Department of Human Resources ("DHR") and the DeKalb Community Service Board ("DCSB") under the Georgia Tort Claims Act ("GTCA"),[1] alleging that the defendants were negligent in failing to properly supervise, monitor, control, and care for I.B. DHR and DCSB filed a motion to dismiss on the ground that they are immune under the doctrine of sovereign immunity and a motion for summary judgment. The defendants appeal the trial court's denial of both motions. We affirm, for reasons that follow.
Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]
So viewed, the evidence shows that I.B. was ordered into the custody of DHR on October 1, 2002 after he ran away from home several times.[3] He was placed in the Gwinnett Children's Center in December 2002, but after a DCSB psychiatrist determined that I.B. was acutely suicidal, the child was placed in the DeKalb Crisis Center and then transferred to Peachford Hospital for treatment, where he continued to threaten suicide and exhibited other symptoms of mental illness. Based on his problems, DHR and DCSB placed I.B. in therapeutic foster care with Darlene and Lindsay Blair.
While living with the Blairs, I.B. was delusional, tried to run away, and made numerous suicide threats. Based on acute psychosis and suicide threats, I.B. was involuntarily admitted to Georgia Regional Hospital in November 2002, where he was evaluated by a physician who determined that he might be mentally ill and might present a substantial risk of imminent harm to himself or others or might "be so unable to care for [his] own physical health and safety as to create an imminently life-endangering crisis."[4] I.B. was discharged from Georgia Regional on December 5, 2002, and he returned to the Blairs' home.
On January 3, 2003, the Blairs both went to work, leaving I.B. at home with Darlene's father-in-law, James Tillman, and her 17-year-old son, B.J.[5] At approximately 3:00 *117 p.m.,[6] B.J. called Darlene at work and told her that I.B. was threatening to run away. Darlene immediately headed home, remaining on her cell phone with B.J. While Darlene was on the phone, B.J. told her that I.B. had succeeded in getting out of the house; B.J. followed him, but I.B. disappeared. Darlene called the police from her cell phone, and when she arrived home, she, B.J., and Tillman looked for I.B. When they were unable to locate him, Darlene called 911 a second time.[7] Later that night, a social worker from Grady Hospital called and informed the Blairs that I.B. had been hit by a car at approximately 6:00 p.m. and had sustained serious injuries.
I.B.'s parents, Bulbalia and Kerr, filed suit against DHR and DCSB,[8] alleging that
as a result of the negligence of . . . DHR. . . and DCSB to properly care for, supervise, control[,] and monitor [I.B.], that [I.B.] was allowed to wander off from the foster care facility in which he was placed. Darlene Blair failed to monitor [I.B.] closely, thereby allowing him to leave her foster care facility. Said failure to monitor [I.B.] resulted in severe and painful injuries to [I.B.]. . . .
The [d]efendants, DHR . . . and DCSB[,] individually and in combination with Darlene Blair, knew or should have known of the risks associated with the failure to properly monitor [I.B.]. Darlene Blair did not have proper precautions or practices in place in order to provide for the safety and security of [I.B.] . . . and did not appropriately apply and implement necessary precautions in order to provide for the safety and security of [I.B.] on January 4, 2003.[9]
The defendants filed a motion to dismiss and a motion for summary judgment. Following a hearing, the trial court denied both motions in a single order, which the defendants have appealed.
1. The defendants filed a motion to dismiss, contending that their acts fell within the discretionary function exception to the State's waiver of sovereign immunity under the GTCA. The trial court denied the motion, concluding that the plaintiffs' complaint "raises no question as to the propriety of the exercise of this discretion."[10] The defendants argue that the trial court erred in denying their motion to dismiss on this basis. We disagree.
Under the GTCA, the State has agreed to waive its sovereign immunity for the torts of state employees and officers acting within the scope of their employment, subject to certain exceptions.[11] One such exception is the "discretionary function exception," under which the State has no liability for losses resulting from "[t]he exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved is abused."[12] The GTCA defines a "[d]iscretionary function or duty" as "a function or duty requiring a [S]tate officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration *118 of social, political, or economic factors."[13]
In Brantley v. Dept. of Human Resources,[14] our Supreme Court emphasized that "the definition of discretionary function set forth in § 50-21-22(2) plainly requires not only the exercise of discretion or judgment, but also that that discretion or judgment concern a `policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors.'"[15] In Brantley, the Court concluded that a foster parent's "decision to leave a two-year-old child unattended in a swimming pool is an insufficient basis on which to invoke the discretionary function exception. If such a decision were considered a discretionary function, the exception would swallow the waiver."[16] The Court went on to explain that
[l]ike the discretion that was exercised in [Dept. of Transp. v.] Brown[17] in designing and operating a road, the decision whether to leave a two-year-old child unattended in a swimming pool was not a basic governmental policy decision and was not the type of governmental decision that should be protected from review by the judiciary. Instead, we conclude that the decision was one of routine child care, and therefore does not fall within the discretionary function exception.[18]
This reasoning is equally applicable to the plaintiffs' claims here that the foster parents failed to properly care for, supervise, control, and monitor I.B. in their home. Thus, the trial court did not err in denying the defendants' motion to dismiss.
We note that the trial court correctly determined that the plaintiffs' complaint did not base their claims on the State's decision to place I.B. in a therapeutic foster home. Therefore, we need not reach the question of whether the State's placement decision itself falls within the GTCA's discretionary function exception.
2. The defendants also argue that the trial court erred by denying their motion for summary judgment because there is no evidence that the defendants' actions or inactions "proximately caused I.B. to run away." We find this argument unpersuasive.
"[Q]uestions of negligence, diligence, contributory negligence and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in solving them, except in plain and indisputable cases."[19] As we have stated previously,
the routine issues of negligence cases are generally not susceptible of summary adjudication, and that summary judgment should not be granted in these cases unless the nonexistence of liability is plain, palpable, and indisputable. If reasonable minds can differ on the cause of the injury, the case is not plain, palpable, and indisputable and it should go to the jury.[20]
The rule regarding proximate cause is that
the injury must be the natural and probable consequence of the negligence, such a consequence as under the surrounding circumstances of the case might and ought to have been foreseen by the wrong-doer as likely to flow from his act. The injury must be the direct result of the misconduct charged; but it will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended.[21]
*119 The evidence regarding proximate cause in the instant case is not plain, palpable, and undisputed. The evidence here would allow a jury to conclude that the natural and probable consequence of leaving I.B.who had repeatedly run away in the past and specifically threatened to kill himself by running into the street in front of carswithout the presence of either of the foster parents was that I.B. would get out of the house, run into the street, and be struck by a car. Accordingly, the trial court did not err in denying summary judgment to the defendants.
Judgment affirmed.
BLACKBURN, P.J., and ADAMS, J., concur.
NOTES
[1] OCGA § 50-21-20 et seq.
[2] (Citations omitted.) Matjoulis v. Integon Gen. Ins. Corp., 226 Ga.App. 459(1), 486 S.E.2d 684 (1997).
[3] The DCSB referral form, which was signed by a physician, indicated that I.B. had been abandoned by his mother; I.B. had run away on numerous occasions; his father had failed to pick I.B. up from the police and/or juvenile court several times; and I.B. had suffered a psychotic episode.
[4] The admission document stated that I.B. had engaged in the following conduct on the day of admission: "[r]epeated runaway all day; threats to run in front of cars, sitting in middle of road; required police assistance 2x today, oppositional, cursingthreatening staff."
[5] The DCSB contract with the Blairs required them, as therapeutic foster parents, to "be in the [h]ome when the Consumer [(foster child)] is at home or have a Board approved in-home care giver for the Consumer present in the Therapeutic Provider's absence. The Consumer shall not be left unsupervised at any time." The contract also mandated that the foster parents are "[t]o refrain from placing the Consumer, even temporarily, in the care of another person other than the Board or the Board's approved service facilities. . . without prior approval from the Board. . . ." As noted by the trial court, the contract does not define the phrase "Board approved in-home care giver." Here, the parties agree that Tillman was not "Board approved" to care for I.B.
[6] Darlene was working the 7:00 a.m. to 7:00 p.m. shift at a hospital.
[7] Darlene also notified DCSB that I.B. had run away.
[8] Bulbalia and Kerr also filed a negligence claim against the driver of the car that struck I.B., but that claim is not before us on appeal.
[9] Under the GTCA, "[s]tate officer or employee" includes foster parents. OCGA § 50-21-22(7). The plaintiffs alleged in the complaint that the state defendants "are jointly and severally liable for acts and omissions of Darlene Blair, and her agents or employees, whose acts and omissions as employees, agents[,] or servants of [the State] were within the scope of said agency or employment.. . ."
[10] (Footnote omitted.)
[11] See OCGA § 50-21-23.
[12] OCGA § 50-21-24(2).
[13] OCGA § 50-21-22(2).
[14] 271 Ga. 679, 523 S.E.2d 571 (1999).
[15] Id. at 682, 523 S.E.2d 571.
[16] (Punctuation omitted.) Id. at 683, 523 S.E.2d 571.
[17] 267 Ga. 6, 471 S.E.2d 849 (1996).
[18] (Punctuation omitted.) Brantley, 271 Ga. at 683, 523 S.E.2d 571.
[19] (Punctuation omitted.) Bussey v. Dawson, 224 Ga. 191, 193-194, 160 S.E.2d 834 (1968).
[20] (Punctuation omitted.) Sutton v. Justiss, 290 Ga.App. 565, 566, 659 S.E.2d 903 (2008).
[21] (Punctuation omitted.) Beasley v. A Better Gas Co., 269 Ga.App. 426, 428(1), 604 S.E.2d 202 (2004).