S12G2002. GEORGIA DEPARTMENT OF HUMAN SERVICES
et al. v. SPRUILL et al.
(751 SE2d 315)

BLACKWELL, Justice.

As a general rule, the sovereign immunity of the State and its departments is waived by the Georgia Tort Claims Act for "the torts of state officers and employees . . . acting within the scope of their official duties or employment," OCGA § 50-21-23 (a), but there are exceptions to the general rule. See OCGA § 50-21-24 (1)-(13). This

---

case concerns one of these exceptions, commonly known as the "discretionary function" exception. See OCGA § 50-21-24 (2). Here, the guardians of two infant boys sued the Department of Human Services (DHS), alleging that the Clayton County Department of Family and Children Services (DFCS) was negligent in several respects in its investigation of a report that the boys were neglected by their parents.[1] On the motion of DHS, the trial court dismissed the lawsuit, finding that the "discretionary function" exception properly applied, but the Court of Appeals disagreed, and it reversed the dismissal. *Spruill v. Ga. Dept. of Human Svcs.*, 317 Ga. App. 226, 228 (729 SE2d 654) (2012). We issued a writ of certiorari to consider whether the "discretionary function" exception applies in this case, and concluding that it does, we reverse the judgment of the Court of Appeals.

1. The record shows that twin boys — As. M. and Av. M. — were born premature to Jay McCart and Tessa Zelek on November 6, 2006. Almost a year later, on October 17, 2007, McCart and Zelek took the boys to their pediatrician for a routine examination. The pediatrician found that the boys were severely underweight,[2] but he saw no sign that they were in acute distress, and he did not think it necessary at that point to contact DFCS about the boys. Instead, the pediatrician ordered some diagnostic tests to ascertain any medical causes of the failure of the boys to gain weight, and he explained to McCart and Zelek that, if these tests failed to explain the failure to thrive, the boys would have to be admitted to a hospital for further testing and observation.

On November 4, a grandfather of the boys visited the mobile home that McCart and Zelek shared. The grandfather observed that one of the boys "didn't look right," and it appeared to the grandfather that both McCart and Zelek were under the influence of alcohol or drugs.[3] Following his visit, the grandfather reported some of what he had seen to the grandmother of the boys. On November 6, the grandmother telephoned the pediatrician and told him "about [her] concern that [McCart and Zelek] could be using drugs in the house."

---

[1] A county DFCS is an "instrumentality" of DHS. See *Floyd County Grand Jury v. Dept. of Family & Children Svcs.*, 218 Ga. App. 832, 833 (1) (463 SE2d 519) (1995). In this appeal, no one disputes that DHS sometimes may be liable for the torts of county DFCS personnel.

[2] As of October 17, As. M. weighed 10 pounds, 12 ounces, and Av. M. weighed 10 pounds, 8 ounces.

[3] McCart has acknowledged that he abused alcohol, and he has acknowledged that he and Zelek both abused prescription drugs. Zelek has claimed that she only took prescription drugs that properly had been prescribed for her, but we note that she was convicted in 2005 of forging prescriptions.

The same day, the pediatrician made a report about the boys to Henry County DFCS.[4] In that report, the pediatrician disclosed that the boys recently had been seen in his office, that they had failed to gain much weight, and that they were failing to thrive. The pediatrician also reported that the boys had special medical needs as a result of their premature birth, but McCart and Zelek sometimes failed to keep medical appointments for the boys. In addition, the pediatrician said that there was some reason to think that both parents might be abusing alcohol or drugs, and he added that McCart appeared to have "some type of brain damage."[5] Henry County DFCS dispatched a social services worker to the McCart-Zelek home, but the worker was unable to locate the home and determined later that the home was situated just across the Clayton County line in any event.[6] On the afternoon of November 7, Henry County DFCS referred the report to Clayton County DFCS.

When it received the referral, Clayton County DFCS assigned the report to Eric Jackson for investigation. Jackson, a field program specialist, had 17 years of experience with DFCS, including 12 years as a case manager. To begin, Jackson telephoned Henry County DFCS to confirm that he had received all available information about the case, and he telephoned the office of the pediatrician, only to learn that it was closed for the day. Jackson then arranged for an on-call DFCS social services worker to make an unannounced visit to the McCart-Zelek home that evening. The on-call worker went to the home, but no one responded when he knocked on the door and telephoned the home.[7]

The next morning, Jackson spoke with his supervisor about the case, reviewed the report of the on-call worker, and twice telephoned the office of the pediatrician. On the first call, Jackson spoke with an assistant of the pediatrician, who told Jackson that the boys had been

---

[4] The pediatrician kept his office in Henry County, and so, he made his report to Henry County DFCS.

[5] At the October examination, the pediatrician had concerns about McCart, especially his slurred speech and unconventional attire. The pediatrician has said, however, that his concerns were resolved by a revelation that McCart had a brain tumor. But when the grandmother called the pediatrician to report her concerns, she told him that she did not know anything about McCart – her son – having a brain tumor and that her concerns were about the behavior of *both* parents and not just McCart. The pediatrician testified that this revelation by the grandmother made him think that McCart and Zelek might be abusing drugs in the house.

[6] The mobile home that McCart and Zelek shared was located in a mobile home park, parts of which were in Henry County, and parts of which were in Clayton County.

[7] According to the on-call worker, he knocked on the front and back doors of the mobile home, he listened at the door for children crying or other sounds that might indicate someone was inside, and he waited in his car for 30 to 40 minutes, watching the home for lights or movement.

diagnosed as failing to thrive, and who shared the weights of the boys as of their October examination. On the second call, Jackson spoke with the pediatrician, who warned that the boys were "going to be very small," and who advised Jackson that he ought not be "alarmed and panic" when he saw them. The pediatrician also informed Jackson that he had scheduled testing and another appointment with the boys, that the boys were not in acute distress, and that his "main concern was for the parents to be drug tested and their parenting skill [to] be assessed."

The same day — November 8 — Jackson made an unannounced visit to the McCart-Zelek home, knocked several times on the door, and heard no response. Jackson then telephoned Zelek, but he got no answer and left a voicemail message for her. Jackson also telephoned his supervisor to report on the status of the investigation. As Jackson was returning to his office, Zelek returned his call, explaining that the family was "at the family cabin" in North Carolina and would return home on November 12. According to Jackson, Zelek was "very articulate," and he had no concern that she was trying to avoid him. Jackson and Zelek made arrangements for Jackson to visit the family after they returned.[8]

On the morning of November 13, Jackson visited the McCart-Zelek home, where he was greeted by McCart and found Zelek and the boys on a sofa. Zelek was seated, with one boy in her lap, and the other sleeping to her side, both wearing sleepers. Zelek said that she had just fed the boys, and Jackson saw two empty bottles on a nearby table. Jackson sat next to Zelek, and he watched as Zelek burped the boy in her lap and then rocked him to sleep. At that point, Zelek asked Jackson if McCart could put the boys to bed, and Jackson agreed. As McCart carried the boys to their bedroom, Jackson followed, and he inspected their bedroom, as well as most of the other rooms in the mobile home.[9]

Jackson then discussed the concerns reported by the pediatrician with McCart and Zelek. When he asked about the small size of the boys, Zelek said that As. M. weighed approximately 11 pounds, 4 ounces, and she said that Av. M. weighed about 11 pounds. She added that she had her own concerns about their pediatrician, who had

---

[8] Although Zelek has continued to maintain that the family was, in fact, in North Carolina on November 8, McCart has admitted that the family was at home, but they hid from Jackson when he knocked on their door. A grandmother of the boys – one of the guardian-plaintiffs in this case – also has acknowledged that she knew that the family was hiding from DFCS, but she did not inform the pediatrician or DFCS that the family was hiding.

[9] More specifically, Jackson inspected every room in the home except the bedroom that McCart and Zelek shared, in which they had put their dog.

failed, she said, to get the boys enrolled in a State program known as "Babies Can't Wait."[10] She truthfully informed Jackson that the children were being treated not only by the pediatrician, but also by a neurologist, a physical therapist at Children's Healthcare of Atlanta, and a chiropractor. About McCart, Jackson was told that he had been in an automobile accident and had a brain tumor. After the boys were taken to their bedroom, Jackson spoke with McCart and Zelek for at least 45 minutes.

At the end of his visit, Jackson prepared a safety plan, which identified the areas of concern for the boys, as well as the steps that McCart and Zelek promised to take to address those concerns, and McCart and Zelek both signed the plan. Jackson also told them that DFCS would work with them to address the needs of the boys, including by helping them to enroll in "Babies Can't Wait." Jackson also told them that DFCS would work with them to address McCart's medical needs. In the days that followed his visit, Jackson worked to secure additional support for the family, including from "Babies Can't Wait." In addition, Jackson arranged for a DFCS contractor to screen McCart and Zelek the next day for recent drug use. Jackson received the results of the drug screen on November 15, and they did not indicate recent drug use by either parent.

There is some dispute about what happened in the McCart-Zelek home in the days that followed the drug screen. According to Zelek, she became sick, and she took medications for her sickness, but, she says, only medications that had been prescribed for her. McCart, on the other hand, has acknowledged that he abused alcohol and drugs during that time. Both McCart and Zelek have admitted that they did not feed the boys between November 15 and November 20, and both have attempted to offer excuses for their neglect. McCart has claimed, for instance, that he believed that their grandmother fed the boys on November 16. The grandmother, however, has said that she did not feed the boys — she visited the McCart-Zelek home on November 16, but she says that she did not go inside — but she recalls McCart feeding one of the boys that day. McCart also has claimed that a friend — described by Zelek as a "drug friend" of McCart — fed the boys during this period. Zelek has said that she believed that McCart was feeding the boys. In any event, it is undisputed that the boys were neglected between November 15 and November 20, and that is all we

---

[10] "Babies Can't Wait" is a program administered by the Maternal and Child Health Section of the Department of Public Health. See http://dph.georgia.gov/maternal-and-child-health-section (visited October 25, 2013).

really need to know for purposes of this appeal.[11]

On November 20, several relatives arrived at the McCart-Zelek home, where they found McCart and Zelek in a state that they described as "semi-conscious" or "unconscious." These relatives called an ambulance for McCart and Zelek, and they delivered the boys to their aunt, who agreed to care for them. After taking the boys, the aunt became increasingly concerned about their condition, and she telephoned their pediatrician. He advised the aunt to take the boys to the hospital, and early on the morning of November 21, they arrived at Children's Healthcare of Atlanta at Egleston. The boys were severely malnourished, emaciated, covered in sores, and "within hours to days" of death. As. M. weighed slightly less than ten pounds, and Av. M. weighed barely nine pounds. They were admitted to the hospital and survived their ordeal, and their grandmother and great-aunt later were appointed as their guardians.

The guardians filed this lawsuit against DHS, alleging that Clayton County DFCS — specifically through the actions and inactions of Jackson — was negligent in its investigation of the report of the pediatrician. In particular, the guardians complain that Jackson failed to see the boys sooner, that when he saw them, he did not undress and physically examine them, and that he failed to visit the McCart-Zelek home unannounced. If only Jackson had conducted his investigation differently, the guardians contend, the boys might have been removed from the custody of their parents before November 15, and they would not have suffered the severe neglect that followed. Upon the motion of DHS, the trial court dismissed the lawsuit, concluding that the "discretionary function" exception applied to the investigation undertaken by Jackson, and DHS, therefore, had sovereign immunity from the lawsuit. As we noted earlier, the Court of Appeals reversed. *Spruill*, 317 Ga. App. at 228.

2. The Tort Claims Act preserves sovereign immunity from, among other things, "liability for losses resulting from . . . [t]he exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved is abused." OCGA § 50-21-24 (2). The Act defines a "discretionary function or duty" as a "function or duty requiring a state officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors."

---

[11] McCart later was convicted upon a guilty plea of cruelty to children, deprivation of a minor, and forgery of prescriptions. And following a jury trial, Zelek also was convicted of cruelty to children, deprivation of a minor, and forgery. After the boys were removed from their custody, both McCart and Zelek failed drug screens.

OCGA § 50-21-22 (2). So, for the "discretionary function" exception to apply, it must be shown that a state officer or employee was afforded discretion with respect to the conduct that is alleged to amount to a tort, that an exercise of the discretion afforded amounts to "[a] policy judgment . . . based upon a consideration of social, political, or economic factors." See *Brantley v. Dept. of Human Resources*, 271 Ga. 679, 682 (523 SE2d 571) (1999). See also *United States v. Gaubert*, 499 U. S. 315, 322-325 (II) (111 SCt 1267, 113 LE2d 335) (1991) (discussing "discretionary function" exception under Federal Tort Claims Act).[12]

The "discretionary function" exception serves to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *Brantley*, 271 Ga. at 682-683 (citation and punctuation omitted), and in light of its function, we have construed the exception to apply only to an exercise of discretion that amounts to "[a] governmental policy decision[ ]." *Edwards v. Ga. Dept. of Children & Youth Svcs.*, 271 Ga. 890, 892 (525 SE2d 83) (2000). The exception does not extend, we have found, to an exercise of a more routine discretion, even if that discretion might be affected in some way by social, political, or economic factors. See *Dept. of Transp. v. Brown*, 267 Ga. 6, 7 (1) (471 SE2d 849) (1996). That said, the exception is not limited to "policy and planning level employees," and it may properly extend as well to "employees who make day-to-day operational and management decisions." *Brantley*, 271 Ga. at 683 (citation and punctuation omitted). "It is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." Id. (citation and punctuation omitted).

The Court of Appeals concluded that this case involves no "governmental policy decisions," reasoning that

> Jackson's decisions regarding the investigation of the reported neglect and malnourishment of the minor children, including his decision not to visually inspect the condition of their bodies, were not governmental policy decisions that are insulated from judicial review. Instead, those were matters of a routine investigation of reported child neglect that do

---

[12] We previously have looked to *Gaubert* for guidance in construing our own "discretionary function" exception, noting that the definition of "discretionary function or duty" in the Georgia Tort Claims Act "is almost identical to the definition of discretionary function that has been developed by the federal courts in construing the discretionary function exception to the Federal Tort Claims Act." *Brantley*, 271 Ga. at 682.

not fall within the discretionary function exception.

*Spruill*, 317 Ga. App. at 228. In support of its conclusion, the Court of Appeals relied upon our decisions in *Edwards* and *Brantley*, as well as its own decision in *Ga. Dept. of Human Resources v. Bulbalia*, 303 Ga. App. 659 (694 SE2d 115) (2000). See *Spruill*, 317 Ga. App. at 227-228. Those cases, however, involved the routine care of children in the custody of the State and the decisions of their state custodians, who were acting in loco parentis. See, e.g., *Edwards*, 271 Ga. at 890 (claim that Youth Development Center personnel were negligent in failing to provide proper medical care to juvenile in their custody); *Brantley*, 271 Ga. at 679 (claim that foster parents were negligent in leaving two-year-old foster child alone in swimming pool); *Bulbalia*, 303 Ga. App. at 659-660 (claim that foster parents were negligent in failing to supervise eleven-year-old foster child, who was struck by a car).[13] When agents of the State act in loco parentis, they exercise a discretion informed in significant part by the best interests of the child. See *Parham v. J. R.*, 442 U. S. 584, 619 (99 SCt 2493, 61 LE2d 101) (1979) ("state agency having custody and control of the child *in loco parentis*" has duty to consider best interests of the child). See also *Novak v. Cobb County-Kennestone Hosp. Auth.*, 849 FSupp. 1559, 1577 (V) (B) (2) (N.D. Ga. 1994). But when such agents act as representatives of the sovereign, they exercise a different sort of discretion, one that may be informed in significant part by considerations of public policy. Here, Jackson was acting not in loco parentis toward the boys, but instead as an agent of the State assigned to conduct an investigation. That fact distinguishes this case from *Edwards*, *Brantley*, and *Bulbalia*, and those precedents simply are not very pertinent, we think, to the proper resolution of this case.[14]

The guardian-plaintiffs contend that the "discretionary function" exception does not apply in this case for two reasons. First, they say, DFCS policy did not afford Jackson discretion to make some of the choices that he made in the pursuit of his investigation. Second,

---

[13] Our Court of Appeals previously has recognized that foster parents stand in loco parentis to their foster children. *Brown v. Phillips*, 178 Ga. App. 316, 317 (1) (342 SE2d 786) (1986). And this Court has acknowledged that government officers and employees having custody of children and responsibility for their care and upbringing also may stand in loco parentis to such children. *Bd. of Ed. of Cartersville v. Purse*, 101 Ga. 422, 435 (28 SE 896) (1897).

[14] We hinted at such a distinction in *Edwards*, citing *Darling v. Augusta Mental Health Institute*, 535 A2d 421 (Me. 1987), as a case "distinguishing between psychiatrist's decision concerning involuntary commitment to state mental hospital, which constitutes a discretionary function, and doctor's negligent medical treatment of patient[, which does not]." 271 Ga. at 893, n.18.

they argue, even if Jackson did have some discretion, his exercises of that discretion were not sufficiently informed by "social, political, and economic factors" to amount to "government policy decisions."[15] We are not persuaded.

(a) We first consider the extent to which DFCS policy afforded discretion to Jackson. According to the guardian-plaintiffs, Jackson had no discretion with respect to three aspects of his investigation. He was absolutely required, they contend, to see the boys within 24 hours of his receipt of the report of the pediatrician. He also was absolutely required, they argue, to visit the McCart-Zelek home *unannounced*. And when he visited the home on November 13, 2007, he was absolutely required, they say, to undress the boys and visually inspect their undressed bodies. DFCS policy, the guardian-plaintiffs urge, did not afford Jackson any discretion to do otherwise.

About seeing the boys sooner than Jackson did, DFCS policy requires "an immediate to 24-hour response" to a report of the maltreatment of a child less than five years of age. Within that time, the policy provides, DFCS personnel must lay eyes upon the child, and children too young to sit for an interview must be "observe[d] for physical indicators of maltreatment." But the policy also acknowledges that there sometimes may be "[j]ustif[iable] reasons for not meeting the response time," and it provides that DFCS personnel must document those reasons if they are unable to make contact with a child during the initial response period. In this case, Jackson arranged for an on-call worker to go to the McCart-Zelek home on the day that Clayton County DFCS received the report, and Jackson himself went to the home on the next day. Even if the family was inside the home on these occasions, the on-call worker and Jackson saw no indication that they were, and it is undisputed that both the on-call worker and Jackson properly documented the reasons why they were unable to visit the boys when they went to the home. In the circumstances in which Jackson found himself, that was a determination that was committed by DFCS policy to his discretion.

About making an unannounced visit, DFCS policy provides generally that DFCS personnel should "[p]roceed unannounced to the home setting," but it affords discretion to those personnel to determine — in consultation with their supervisors — how best to proceed when an initial attempt to contact a family is unsuccessful. And even as to the initial attempt, the policy affords a limited discretion to

---

[15] The guardian-plaintiffs do not contend that Jackson exercised no discretion. They only argue that his exercises of discretion were not authorized by – and, in fact, were contrary to – DFCS policy and that his exercises of discretion did not amount to "government policy decisions" in any event.

DFCS personnel to announce their visits.[16] Again, Jackson attempted twice — once through the on-call worker, then again himself — to visit the McCart-Zelek home unannounced. Those attempts were unsuccessful. Jackson consulted with his supervisor about his investigation. And he determined to attempt contact with Zelek by telephone and to arrange a visit. That was something committed by DFCS policy to his discretion.

Finally, with respect to undressing the boys, the guardian-plaintiffs point to a DFCS policy that requires personnel to "[u]ndress infants under age one year to determine whether there are any physical signs of child maltreatment" and to "[o]bserve all reported injuries." Their reliance upon these policies, however, is misplaced. As to the absolute requirement to undress children less than one year of age, the boys were not less than one year of age when Clayton County DFCS received the report of their neglect.[17] As to the failure of Jackson to "[o]bserve all reported injuries," the report did not indicate any particular injuries, only that the children were underweight and failing to thrive, something that would have been evident to Jackson when he saw the boys, even without undressing them.[18] And in any event, DFCS policy allowed 30 days for Jackson to conduct his investigation, and his decision not to undress the boys and search for injuries upon his initial visit with the family was one committed to his discretion.

---

[16] Although the policy gives several examples of circumstances in which an initial announced visit is not permitted, no one contends that the report of the pediatrician in this case indicated that such circumstances were present. For instance, the policy provides that no announced visit should be made when there is good reason to believe that a child is in imminent danger or that the family will not cooperate with DFCS. Here, the pediatrician indicated that the boys were not in acute distress, and he said nothing that should have led Jackson to think that McCart and Zelek would not cooperate.

[17] The guardian-plaintiffs note that Jackson was reprimanded on November 30, 2007 by the Regional Director of Clayton County DFCS, and he was terminated from his position on December 7. They note as well that the reprimand was based on the belief that the boys were less than one year of age. The record clearly shows that belief, however, to be unfounded. And both the Regional Director and Jackson's immediate supervisor have testified that — now that they understood that the boys were not less than one year of age — Jackson did not violate any DFCS policy in his investigation of the report.

[18] The guardian-plaintiffs argue that Jackson should have undressed the boys to look for signs of malnourishment. Although Henry County DFCS coded the report as one relating to "N1 Malnourishment/Failure to Thrive," the pediatrician reported that it was the parents' drug use that he believed should be investigated, and that the suspected drug use "increased [his] level of concern for having appropriate caregivers" given the boys' medical needs. So, while the pediatrician reported that the boys were failing to thrive insofar as they had not gained sufficient weight, he also told Jackson that he ought not be alarmed when he saw the boys, that they were "going to be very small," and that the pediatrician had scheduled testing to identify any medical causes of the failure to thrive.

(b) We now consider whether the discretion exercised by Jackson amounts to a discretion to make "governmental policy decisions" based on "social, political, and economic factors." Like the Court of Appeals, the guardian-plaintiffs attempt to characterize Jackson's investigative decisions as "routine child care" decisions, and also like the Court of Appeals, they rely principally upon our decisions in *Edwards* and *Brantley*. But as we noted earlier, those cases are not much like this one.

The decisions as to which Jackson exercised discretion — how best to investigate the pediatrician's report, including how best to make initial contact with the boys, how best to assess the extent to which the boys were in danger, and whether to insist in his initial visit that the children be undressed for his inspection — were decisions that necessarily implicated a number of "social, political, and economic" policy considerations. The State indisputably has a strong and compelling interest in keeping the most vulnerable members of society from physical harm. See *Stanley v. Illinois*, 405 U. S. 645, 652 (II) (92 SCt 1208, 31 LE2d 551) (1972). See also *Bendiburg v. Dempsey*, 909 F2d 463, 470 (11th Cir. 1990). "This unquestionably compelling state interest, however, may not be used as a pretense for arbitrary governmental intrusion into the private affairs of its citizens." *Doe v. Heck*, 327 F3d 492, 525 (II) (B) (7th Cir. 2003). After all, our Constitution secures the fundamental "right of parents to direct the upbringing of their children," *Troxel v. Granville*, 530 U. S. 57, 65 (120 SCt 2054, 147 LE2d 49) (2000), and it "protects a private realm of family life which the state cannot enter without compelling justification." *Arnold v. Bd. of Ed. of Escambia County*, 880 F2d 305, 313 (11th Cir. 1989). See also *Clark v. Wade*, 273 Ga. 587, 593 (544 SE2d 99) (2001) ("The United States Supreme Court has recognized that parents have a fundamental liberty interest in the care, custody, and management of their children."); *Nix v. Dept. of Human Resources*, 236 Ga. 794, 795 (225 SE2d 306) (1976) ("There can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to [his or her] offspring."). Moreover, the State itself also has a legitimate interest in the preservation of the family. See *Jones v. Swett*, 244 Ga. 715, 718 (261 SE2d 610) (1979). See also OCGA § 15-11-58 (a) (2) (in deprivation cases, "reasonable efforts shall be made to preserve and reunify families").

In every investigation of alleged parental neglect of a child, a balance must be struck between these competing interests, and DFCS policy acknowledges as much. For instance, the DFCS "Statement of Good Practice Principles" advises DFCS personnel to keep in mind not only that children are entitled to safety and security, but also that parents have a right not to be "unduly interfered with by the

[S]tate." Likewise, DFCS policy acknowledges that DFCS personnel must make "critical judgments that assertively protect children from abuse and neglect, yet, which do not unduly hinder a parent's right to rear a child without government interference."

In addition, DFCS has only limited investigative resources, and its personnel charged with investigating reports of child neglect have only limited time. How best to allocate the limited resources and time available for investigation — when, for instance, DFCS personnel have tried unsuccessfully to make contact with a family — necessarily requires a policy judgment as well, weighing the limited resources and time available, the perception of the risk of harm in a particular case, the demands of other cases that must compete for the limited resources and time, and the enforcement and protective priorities of the agency. Striking such a balance inherently requires a consideration of social, economic, and political factors.[19] See *United States v. S. A. Empresa de Viacao Aerea Rio Grandense*, 467 U. S. 797, 820 (IV) (104 SCt 2755, 81 LE2d 660) (1984).

For these reasons, courts in other jurisdictions have applied similar "discretionary function" exceptions to exercises of discretion like that Jackson exercised in this case. See, e.g., *Earle v. State of Vermont*, 910 A2d 841, 851-852 (Vt. 2006) ("We hold that the child protection decisions made in this case in response to allegations of abuse . . . fall squarely within the intended scope of the discretionary function exception."); *Olson v. Ramsey County*, 509 NW2d 368, 371 (Minn. 1993) (where county social worker declined to remove two-year-old child from custody of her mother, the "social worker was required to weigh the competing governmental policies of protecting the child from danger within the family and keeping the family together, a decision involving profound social considerations and, consequently, a decision at the policymaking level protected by discretionary function immunity"). See also *Bolyard v. Kansas Dept. of Social and Rehabilitation Svcs.*, 912 P2d 729, 735 (Kan. 1996) (decision to leave children in custody of their mother was within the discretionary function exception and "involve[d] discriminating judgment between competing interests . . ."); *Washington Metro. Area Transit Auth. v. Tinsley*, 32 A3d 75, 85 (Md. Ct. Spec. App. 2011) (decision about when to clean train platform involved the exercise of

---

[19] That is not to say that *every* decision that concerns the use of agency resources requires such policy judgments. For instance, "[w]hether to buy copier paper from a particular vendor, and in which colors, are decisions that might be affected by all three factors, but they are not policy decisions." *Brown*, 267 Ga. at 7 (1). But buying routine office supplies for an agency, and allocating its investigative resources based on the perceived risk in particular cases and the investigative priorities of the agency, are quite different.

policy judgment). Our own Court of Appeals has held as well that the "discretionary function" exception applies to investigative and law enforcement decisions committed to the discretion of state officers and employees. See, e.g., *Lewis v. Ga. Dept. of Human Resources*, 255 Ga. App. 805, 811 (567 SE2d 65) (2002) ("A decision on which of numerous possible actions the department should take in enforcing health regulations entails policy judgments in which alternate courses of action must be weighed in light of competing social, political, and economic factors rather than the simple execution of a specific duty."); *Rhoden v. Dept. of Public Safety*, 221 Ga. App. 844, 845-846 (1) (473 SE2d 537) (1996) (law enforcement officers declining to interfere with arrest and alleged excessive force by other officers "called for such consideration [of social, political, or economic factors]"); *Bd. of Public Safety v. Jordan*, 252 Ga. App. 577, 584 (1) (556 SE2d 837) (2001) (termination of superintendent of Georgia Police Academy was "grounded in social, economic, or political goals or a combination thereof"). Here, Jackson's decisions about how to investigate the pediatrician's report required Jackson to balance competing policy considerations, and the trial court did not err when it determined that Jackson's choices were rooted in the consideration of policy factors. The "discretionary function" exception was properly applied in this case by the trial court, and the Court of Appeals erred when it reversed the trial court's dismissal of the complaint against DHS.

*Judgment reversed. All the Justices concur, except Hunstein, J., who concurs in judgment only.*

DECIDED NOVEMBER 18, 2013.

*Samuel S. Olens, Attorney General, Kathleen M. Pacious, Deputy Attorney General, Loretta L. Pinkston, Jennifer L. Dalton, Senior Assistant Attorneys General, Robert L. Bunner, Ronald S. Boyter, Jr., Assistant Attorneys General*, for appellants.

*James A. Attwood*, for appellees.