**THIRD DIVISION**
**MILLER, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 14, 2016**

# In the Court of Appeals of Georgia

A16A0224. GRANT et al. v. GEORGIA FORESTRY
            COMMISSION et al.

A16A0225. GRANT et al. v. GEORGIA FORESTRY
            COMMISSION et al.

MCMILLIAN, Judge.

In these related cases, Carol Grant[1] ("Grant") brought wrongful death actions

against the Georgia Forestry Commission ("GFC") and the Georgia Department of

Transportation ("GDOT") arising out of an automobile collision that resulted in the

death of Grant's husband, Myles N. Grant, and her son, Joell D. Grant. Grant appeals

---

[1] In Case No. A16A0224, Grant brought suit " individually and as the surviving
spouse of Myles N. Grant, deceased, and as temporary administratrix of the Estate of
Myles N. Grant, deceased." In Case No. A16A0225, Grant brought suit "individually
and as sole surviving heir of Joell D. Grant, deceased, and as temporary
administratrix of the Estate of Joell D. Grant, deceased."

the trial court's dismissal of GFC and GDOT on the grounds that the doctrine of sovereign immunity bars her claims.

The facts are largely undisputed. At approximately 5:30 a.m. or 5:50 a.m.,[2] on March 17, 2011, Grant's husband and son were killed in an automobile accident on Interstate 16 ("I-16") when they collided with a tractor-trailer (the "Accident"). At the time, there was little to no visibility on the interstate due to a combination of smoke and fog.

On the day before the Accident, GFC had issued an online burn permit to Grantley Stewart to burn vegetation on his property in Bulloch County, Georgia. At approximately 3:30 p.m. that day, Douglas Chassereau, Chief Ranger for the Bulloch County GFC fire protection unit, received notice of a fire on Stewart's property, and when he arrived at the property approximately 45 minutes later, he observed a fire burning out of control in an area of forested land and threatening to burn a number of structures. Because forest fires fall within GFC's jurisdiction, Chassereau "took charge" of the fire scene, and he "continuously monitored the fire and assigned manpower and equipment to contain the fire." As a part of his duties, Chassereau

_____

[2] The Complaint alleges that the accident took place at approximately 5:50 a.m., whereas the trial court found that the collision took place at approximately 5:30 a.m.

2

drove State Route ("SR") 67, located several hundred feet north of the fire, where he observed that Bulloch County Sheriff deputies were handling traffic issues and that smoke/fog warning signs for both travel lanes on SR 67 had been posted.

At around 7:00 p.m. that evening, Chassereau determined that the fire appeared to be contained; however, the burned area, which consisted of around 45 acres, continued to smoke. Chassereau observed that the smoke was drifting in a southeasterly direction, away from I-16, which was further to the north of the burned area, and he observed no visibility issues on either SR 67 or I-16. The closest edge of the burned area was approximately 3/4 of a mile from the interstate. However, before Chassereau left the vicinity at around 8:00 p.m., he called Bulloch County 911 to provide notice that smoke was in the area and directed the dispatcher to request that the Georgia State Patrol ("GSP") and the Bulloch County Sheriff's Office continue to monitor the area for possible problems.

GDOT also received notice of the fire on March 16 when the Bulloch County Sheriff's Office called to request that smoke warning signs be posted on SR 67. Joseph Mixon, GDOT's maintenance foreman for Bulloch County, responded to the scene between 4:30 and 5:00 p.m. At the time, GDOT Policy 6670-3 (the "GDOT Policy") required Mixon in his capacity as maintenance foreman to respond to

requests from local law enforcement to place fog/smoke warning signs on state roads. Although Mixon observed no existing visibility issues, he complied with the request of the sheriff's office to place warning signs in both directions on the roadway at around 5:00 p.m. When Mixon returned to the scene at around 7:45 p.m. to check the visibility, he found the conditions clear. After calling the sheriff's office regarding the signs, Mixon left the signs in place overnight at their request.

The next morning, March 17, Chassereau left his house at 5:30 a.m. to return to the burned area and on the way, at around 6:09 a.m., he received a report of the Accident. When he arrived at the scene a few minutes later, he observed that the area was enveloped in dense fog and smoke, resulting "in near zero visibility," although he had no trouble breathing in the fog, indicating that it did not contain enough smoke to compromise his breathing or to cause him to experience other smoke-related symptoms.

Also, around 5:30 a.m. on March 17, Mixon received a call from GDOT's Transportation Management Center ("TMC") indicating that law enforcement had asked that warning signs be placed on I-16. That was the first notice he received of visibility issues on I-16. A few minutes later, TMC called him to report that I-16 had been closed due to the Accident and that law enforcement was asking for assistance

4

in setting up a detour for the eastbound lane of the interstate. Mixon notified his immediate supervisor of these events. They then coordinated notifying additional GDOT personnel to pick up the necessary signage and to bring it to the appropriate interchange on I-16. When Mixon arrived at the interstate that morning, he observed that "fog and smoke had accumulated to such a degree over I-16 that [he] could not see through [his] windshield beyond the front hood of [his] truck."

After the extended discovery period had ended, GDOT and GFC filed motions to dismiss Grant's claims pursuant to OCGA § 9-11-12 (b) (1), asserting that they were entitled to the protection of sovereign immunity, which the trial court granted after a hearing, and these appeals followed.

1. On appeal, Grant asserts that the trial court erred in granting the motions to dismiss because sovereign immunity had been waived under the Georgia Tort Claims Act ("GTCA"), OCGA § 50-21-20 et seq., as to her claims against GFC and GDOT. The Georgia Constitution provides that sovereign immunity extends to the State and all of its department and agencies and that such immunity can only be waived by a constitutional provision or an Act of the General Assembly, "which specifically provides that sovereign immunity is waived and the extent of such waiver." Ga. Const. of 1983, Art. I, Sec. II, Par IX (e). The GTCA provides for a limited waiver

of sovereign immunity for "the torts of state officers and employees while acting within the scope of their official duties or employment," subject to a number of exceptions and limitations, OCGA § 50-21-23 (a), which are set out in OCGA § 50-21-24. At issue in this appeal are the exceptions set forth in OCGA § 50-21-24 (2) and (6).

In reviewing an assertion of sovereign immunity, we must keep in mind that sovereign immunity is not an affirmative defense but instead raises an issue as to the trial court's jurisdiction to try the case. *Dept. of Transp. v. Dupree*, 256 Ga. App. 668, 671 (1) (570 SE2d 1) (2002). The burden of establishing a waiver of such immunity falls to "the party seeking to benefit from that waiver." (Citation and punctuation omitted.) Id. Therefore, in response to GDOT's and GFC's motions to dismiss, Grant bore the burden of establishing a waiver of sovereign immunity as to her claims against each of the two state agencies. Id.

Moreover, where a motion to dismiss asserting the protection of sovereign immunity is filed pursuant to OCGA § 9-11-12 (b) (1), as it was here, the trial court is entitled to hear evidence and make relevant factual findings in deciding the issue of immunity. *Rivera v. Washington*, __ Ga. __ (784 SE2d 775) (2016); *Dupree*, 256 Ga. App. at 675 (1) (b); OCGA § 9-11-12 (d). This Court sustains the trial court's

6

factual findings if there is any evidence to support them. *Ga. Dept. of Transp. v. Wyche*, 332 Ga. App. 596, 597 (774 SE2d 169) (2015). But where the underlying facts are undisputed, we review de novo the trial court's application of the law to the undisputed facts. See generally id.; *McCombs v. Southern Regional Med. Ctr.*, 233 Ga. App. 676, 681 (2) (504 SE2d 747) (1998).

2. We turn first to Grant's claims against GFC. In her complaints, Grant asserted that GFC was negligent in (1) failing to notify other governmental agencies of the potentially hazardous conditions caused by the fire; and (2) failing to coordinate with GDOT to put signs in place to warn the public of these potentially hazardous conditions. In support of its motions to dismiss, the GFC argued that it was entitled to sovereign immunity because its actions fell within the exception to the waiver of sovereign immunity set out in OCGA § 50-21-24 (6), and the trial court agreed, finding that GFC was entitled to immunity.[3]

OCGA § 50-21-24 (6) absolves the State from liability for losses resulting from "[c]ivil disturbance, riot, insurrection, or rebellion or the failure to provide, or the

___

[3] As explained more fully in Division 4, GFC did not move to dismiss based on the discretionary function exception in OCGA § 50-21-24 (2), even though the trial court dismissed claims against GFC on this ground.

method of providing, law enforcement, police, or fire protection." Our Supreme Court has interpreted this provision

> as authorizing the application of sovereign immunity to the making of policy decisions by state employees and officers including those relating to the amount, disbursement, and use of equipment and personnel to provide law enforcement, police or fire protection services, and to the acts and omissions of state employees and officers executing and implementing those policies.

*Ga. Forestry Comm. v. Canady*, 280 Ga. 825, 830 (632 SE2d 105) (2006). The Supreme Court later clarified this holding by explaining that "[t]he state is immune from liability if the alleged negligence causing an injury, which injury occurs during implementation of policy, lies in some defect in the policy itself." *Ga. Dept. of Public Safety v. Davis*, 285 Ga. 203, 206 (676 SE2d 1) (2009). However, "[t]he state is not immune from liability where its employee is implementing a non-defective policy, but does so in a negligent manner." Id. Moreover, "[a]lthough the state may be immune from liability for negligence in creating a certain policy which causes injury during its implementation, such immunity is unavailable for an employee's allegedly negligent act or omission which is not authorized by any policy." Id.

8

The parties do not dispute that the policy applicable to GFC's actions was contained in a Memorandum of Agreement dated August 15, 2005 (the "Agreement") in which three state agencies — the GFC, the GDOT, and the GSP — agreed to a chart setting out "Action Procedures for Reduced-Visibility Driving Situations on State Roads." Grant does not allege that these policies were defective, but instead claims that GFC was negligent in implementing them.

In addressing the issue of whether GFC and Chassereau were negligent in implementing the applicable policies in the Agreement, we must consider the division of responsibility to which the three participating agencies agreed. Under the Agreement, GFC has responsibility for reporting to GSP the existence of limited visibility conditions resulting from smoke and the existence of large controlled burns or wildfires in the vicinity of state roadways.[4] GSP then has the responsibility to

_____

[4] In situations involving "Smoke, Smog,Etc." [sic], GFC is assigned the responsibility to:

> Report to the nearest Georgia State
> headquarters the existence of limited
> visibility conditions and location.
> Coordinate with DOT officials to insure that
> signs are properly posted.

> Advise the Georgia State Patrol of the
> existence of large control burns or

9

assess the reported situation to determine what further action needs to be taken.

GSP's responsibility for monitoring the situation continues "until the smoke has

dissipated." Additionally, GSP has the responsibility, as resources permit, to monitor

major highways near reported large controlled burns or wildfires to detect potential

problems. GDOT's responsibility to dispatch crews with signs to the scene is

triggered "upon notification." The dispatched GDOT crew is responsible for the

proper placement of warning signs, with GFC having responsibility for coordinating

with GDOT in the placement of such signs. GDOT also has responsibility for

furnishing additional traffic control "as requested."

Turning first to the claim that GFC negligently failed to notify GSP of

potentially hazardous conditions, after reviewing the plain language of the

Agreement, we agree with the trial court that GFC has the duty to report only *existing*

limited visibility conditions. Nothing in the Agreement imposes a duty upon GFC to

report conditions with the potential to cause future visibility problems. Rather, the

wildfires in the vicinity of state roadways.

(spacing in original document). In addition, the Agreement notes that "Fog is
generally so widespread that it would be logically impossible to address; however,
an isolated patch of fog with sufficient density, to severely restrict or prevent passage
through it, should be treated the same as smoke, smog, etc."

10

Agreement charges GSP with responsibility for monitoring the area surrounding large controlled burns or wildfires, as resources allow, to detect potential problems. Here, the evidence is undisputed that GFC did not become aware of any limited visibility conditions on I-16 until the Accident had already taken place, and thus GFC cannot be said to have negligently implemented its policies. As a result, GFC is protected by sovereign immunity as to such claims.

Likewise, Grant's claim that GFC negligently violated its duty to coordinate with the GDOT in the placement of signs is barred by the doctrine of sovereign immunity. Under the Agreement, this duty to coordinate with GDOT arises only in the case of existing limited visibility conditions, as the description of that duty immediately follows the description of GFC's duty to report such conditions (with no line spacing). In contrast, GFC's duty to report large controlled burns and wildfires appears separately and below the instructions for limited visibility conditions. Because the evidence amply supports the trial court's finding that GFC did not become aware of the limited visibility conditions until the early morning hours around the time that the Accident occurred, any claims based on the purported breach of GFC's duty to coordinate with GDOT is entitled to the protection of sovereign immunity.

However, as previously noted, the Agreement imposes a separate and independent duty on GFC, regardless of visibility conditions, to advise GSP of the existence of any large controlled burns or wildfires in the vicinity of state roadways. Thus, we disagree with the trial court's conclusion that limited visibility conditions were required to trigger any duty on the part of GFC under the Agreement. Although GFC initially permitted the fire as a presumably smaller controlled burn,[5] it grew into an uncontrolled fire that eventually resulted in 45 smoldering acres.[6] The record is silent as to whether GFC advised GSP of the fire while it was still burning. Nevertheless, consistent with the Agreement, after the fire was contained, Chassereau called the Bulloch County 911 operator to request that GSP and the Bulloch County Sheriff's Office be notified of the existence of smoke in the area, even though no

---

[5] Grant also alleged in her complaint that GFC was negligent in issuing Stewart a burn permit under the prevailing weather conditions and surrounding circumstances. GFC argued in its motion that its actions in issuing the burn permit to Stewart fell under the exception set out in OCGA § 50-21-24 (9), which provides that "the state will have no liability for losses resulting from . . . "[l]icensing powers or functions, including, but not limited to, the issuance . . . of . . . any permit, license, certificate, approval, order or similar authorization." Grant conceded below that GFC's actions in issuing the permit fell within the licensing exception set out in subsection (9) and asserts in her appellate briefs that she never asserted that permitting the burn caused the Accident. Accordingly, we need not address this claim on appeal.

[6] The parties apparently do not dispute that the fire would be considered either a large controlled burn or wildfire within the terms of the Agreement.

12

evidence exists that the smoke had resulted in limited visibility on any roadway at that time.

The Agreement does not specify the method for advising GSP of large controlled burns or wildfires, but it clearly requires that GSP be so advised by GFC. Although the trial court found that Chassereau complied with this notification requirement by calling the county 911 operator, we disagree with the trial court's application of the law to the undisputed facts. Evidence that GFC delegated its duty to advise GSP to the county 911 operator, without more, is insufficient to show that GFC carried out its duty, particularly in the absence of evidence in the record that GSP received any notice of the fire, which would then trigger GSP's duty under the Agreement to monitor the situation as resources permitted. See *Davis*, 285 Ga. at 206 (sovereign immunity not available for an employee's negligent omission which is not authorized by any policy). Accordingly, the trial court erred in finding on the existing record that GFC was not negligent in carrying out its duty to advise GSP of the fire and that it was entitled to sovereign immunity on Grant's claim on this ground.[7]

---

[7] In so finding, we express no opinion on the merits of Grant's underlying negligence claims based on GFC's alleged failure to notify, particularly whether Grant will be able to prove that any such failure proximately caused her loss.

13

3. Turning to Grant's claims against GDOT, Grant alleged in her complaints that GDOT was negligent in (1) failing to monitor I-16 for potentially hazardous conditions caused by the fire; (2) failing to assess the hazard posed by the fire in order to develop appropriate traffic control strategies; and (3) failing to warn motorists of the hazards and dangers posed by the smoke and coordinate with GFC to put signs in place to warn the public of these potentially hazardous conditions. In its motions to dismiss, GDOT asserted that it was entitled to sovereign immunity because its actions fell within the exceptions to the waiver of sovereign immunity set out in OCGA § 50-21-24 (2) and (6), and the trial court found that GDOT was entitled to immunity under subsection (2). Even though the trial court failed to address the application of subsection (6) to GDOT, we address this issue under our de novo review of the trial court's ruling.

As an initial matter, we must consider Grant's contention that subsection (6) does not apply to GDOT because it is not "'a law enforcement or fire protection agency.'" But the protections afforded by that provision are not limited to law enforcement or fire protection *agencies*. Rather, that subsection grants sovereign immunity to the State as to claims for losses resulting from "the failure to provide, or the method of providing, law enforcement, police, or fire protection." OCGA § 50-21-

14

24 (6). *Canady* also involved claims arising from an automobile collision that occurred when smoke originating from a controlled burn obscured visibility on a highway.[8] In that case, the Supreme Court defined the scope of subsection (6) to encompass both claims regarding the making of policies to provide fire protection services and to claims of negligence arising from "the acts and omissions of state employees and officers executing and implementing those polices." 280 Ga. at 830. In so ruling, the Supreme Court did not focus on the nature of the agency involved but rather on protecting the State's policy decisions regarding the method of providing police, law enforcement, or fire protection services, including policies addressing the method of handling limited visibility arising from smoke on a roadway. Id. Compare *Davis*, 285 Ga. at 207 (holding that subsection (6) did not apply where state patrol officer was not acting pursuant to any policy in causing collision).

Therefore, to the extent that the Agreement addresses limited sight visibility resulting from smoke caused by fires, it represents a policy decision among three state agencies regarding a method of providing fire protection. Similarly, the GDOT

---

[8] See *Georgia Forestry Comm. v. Canady*, 274 Ga. App. 556, 556-59 (617 SE2d 569) (2005) (outlining the facts surrounding the accident in that case).

Policy, which incorporates and expands on the Agreement, represents a policy decision by that department regarding its role in providing fire protection in such situations. Because GDOT has assumed duties in providing fire protection under the Agreement and its own policy, we find that GDOT may avail itself of the protections provided under subsection (6) for its acts and/or omissions in connection with the fire in this case.

In order to determine whether sovereign immunity bars Grant's claims, we must examine GDOT's duties in the event of low visibility due to smoke from a fire. Under the Agreement, GDOT's responsibility to place signage arises only after it receives notification.[9] Although the Agreement does not specify the source of the notification triggering this duty, the GDOT Policy contemplates that notice may come from two sources – the GSP and other sources – which in turn requires different

---

[9] The Agreement provides that in cases of smoke or smog, GDOT has the obligation:

> Upon notification, dispatch crews with signs to the scene. This crew will be responsible for proper placement of warning signs. Furnish additional traffic control as requested.

16

responses by GDOT. If GDOT receives notice from a source other than GSP about limited visibility conditions due to smoke, smog, or fog, GDOT is directed to "immediately contact the GSP to verify the reports and request their assistance in apprising the severity of the problem and the impact on highway safety." Alternatively, if GDOT is notified by GSP of limited visibility conditions threatening the safety of the traveling public (presumably in the first instance or after GDOT had already notified GSP upon receiving information from another source), the GDOT Policy provides for a more in-depth response, including considering whether to place signage or warning lights at the scene.[10]

---

[10] The GDOT policy provides, in pertinent part, that:

6. When reports of threats to the safety of the traveling public are verified from either the GSP, or the Department's own surveillance by maintenance or other personnel, a response will be triggered and comprised of the following:

a. The Area Engineer or their designee will visit the site and determine the appropriate traffic control strategy to be developed for the incident.

b. The District Traffic Operations Engineer shall assist in the selection of strategy or assessment of needs, upon request.

17

It is clear from our review of the Agreement and the GDOT Policy that Grant's claims for failing to monitor I-16 for hazardous conditions is barred under the doctrine of sovereign immunity because neither policy imposes any duty on the GDOT to monitor roadways for hazardous conditions. Because Grant's negligence claim "lies in some defect in the policy itself," i.e., that the policies should have imposed a duty on GDOT to monitor roadways for hazards, GDOT is immune from liability for any such claims. See *Davis*, 285 Ga. at 206.

---

    c.     The traffic control strategy for consideration shall include, but not be limited to, any one or more of the following:

- Closing the road entirely
- Using alternative routes
- Deploying pilot car techniques
- Displaying advance signage and/or warning lights
- Narrowing the road to a single lane approach
- Notifying the local media
- Other actions.

    d.     The [TMC] in Atlanta should be notified of any verified smoke, smog and/or fog incidents. Include the county, location and traffic control strategies being employed when making notifications.

Grant's claims that GDOT failed to assess the hazard posed by the fire and failed to place signs to warn the motoring public are barred for a similar reason. The only evidence of record indicates that on the morning of the accident, Mixon received a message from GDOT TMC that "law enforcement" had requested signage on I-16. Grant has not pointed us to any evidence identifying the law enforcement agency or agencies involved. Minutes later, Mixon received another notice about the Accident. Because no evidence in the record shows that Mixon or anyone at GDOT received any notice from GSP or anyone else about low visibility conditions on I-16 until shortly before the Accident, we cannot say that GDOT negligently implemented its policy or acted in a way that was not authorized by policy. See *Davis*, 285 Ga. at 206.

In so holding, we recognize that, as Grant argues, GDOT may not have complied with its own policy on the day before the Accident when the Bulloch County Sheriff's Office requested GDOT to place signs on SR 67 as there is no evidence in the record as to whether GDOT ever contacted GSP to assess the situation. However, we fail to see how Grant's losses resulted from any failure to implement that policy as contemplated by OCGA § 50-21-24 (6). Mixon placed signage on SR 67 as requested, and at the time he left the scene, no limited visibility conditions existed on the roadway. Thus, had Mixon contacted GSP at that time, the

19

undisputed evidence shows that there were no existing visibility issues for GSP to assess. And as we have explained, GDOT had no duty to monitor adjacent roadways for potential visibility issues, and neither the Agreement nor GDOT Policy places a duty on GDOT to alert GSP to provide such monitoring.[11]

We find, therefore, that Grant has failed to show any negligence on the part of GDOT in implementing its own policies and thus, she has failed to carry her burden of establishing a waiver of sovereign immunity as to her claims against GDOT. As a result, we affirm the trial court's grant of GDOT's motion to dismiss Grant's claims pursuant to the "right for any reason" rule. See *Bobick v. Community & Southern Bank*, 321 Ga. App. 855, 870 (4) (743 SE2d 518) (2013) (grant of a motion to dismiss will be affirmed if right for any reason).

4. Finally, we consider whether the discretionary function exception found in OCGA § 50-21-24 (2) bars Grant's one remaining claim, asserting that GFC was negligent in performing its duty to advise GSP about the fire. OCGA § 50-21-24 (2)

_____

[11] Similarly, although Grant also asserted that Mixon violated GDOT Policy by failing to notify GDOT TMC on March 16 of a "smoke hazard" caused by the fire, such omission cannot be linked to the Accident the next day because neither the Agreement nor the policy require TMC or any other section of GDOT to monitor the situation involving the smoke. Rather, that responsibility is assigned to GSP, upon notice and as resources allow.

provides that "[t]he state shall have no liability for losses resulting from . . . [t]he exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved is abused." The GTCA expressly defines the term "[d]iscretionary function or duty" to mean "a function or duty requiring a state officer or employee to exercise his or her policy judgment in choosing among alternate courses of action based upon a consideration of social, political, or economic factors." OCGA § 50-21-22 (2).

Although GFC never argued until appeal that it was protected by sovereign immunity under subsection (2), the trial court nevertheless held that the exception under subsection (2) applied because it found "the situation in the instant case concerning GFC to be more like [that] contained [in *Georgia Dept. of Human Svcs. v. Spruill*, 294 Ga. 100 (751 SE2d 315) (2013)]" than in *Davis*, on which Grant relied. We note, however, that although in *Spruill,* the Supreme Court considered and applied subsection (2), 294 Ga. at 105-106 (2), in *Davis*, the Court construed the application of only subsection (6) to the facts in that case and did not address the applicability of subsection (2). 285 Ga. at 204-207. The trial court never undertook to determine whether Chassereau's choice in delegating the duty to advise GSP to the

county 911 dispatcher required the exercise of "a policy judgment in choosing among various alternative actions based on social, political, and economic factors" as required under OCGA § 50-21-22 (2). Accordingly, we find that the trial court applied the wrong test.

Nevertheless, even if we were to apply the proper test on de novo review, we find that the existing record lacks evidence upon which to base such a determination. GFC did not assert the applicability of subsection (2) below, and Grant did not have the opportunity to present evidence and argument in opposition. Therefore, the record is undeveloped as to the factors that may or may not have gone into Chassereau's decision to delegate to the county 911 dispatcher GFC's duty to advise GSP of the Stewart fire. Accordingly, we find that the trial court erred in granting GFC's motion to dismiss under subsection (2) on the existing record.

*Judgments affirmed in part and reversed in part. McFadden, J., concurs. Miller, P. J., concurs fully as to Divisions 1, 2 and 4 and in judgment only as to Division 3.*